**BULK OIL (ZUG) A.G., a Swiss Corporation, Plaintiff,**

**v.**

**SUN COMPANY, INC., a Pennsylvania Corporation, Sun Oil Trading Company, a Delaware Corporation, Sun International, Inc., a Delaware Corporation, and Sun International Limited, a Bermuda Corporation, Defendants.**

**No. 83 Civ. 741 (CES).**

United States District Court, S.D. New York.

Aug. 25, 1983.

---

De Vos & Co., P.C., New York City, for plaintiff; Lloyd M. De Vos, New York City, of counsel.

Parker, Auspitz, Neesemann & Delehanty, New York City, for defendants; John Delehanty, New York City, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

This case concerns a contract between plaintiff Bulk Oil (Zug) A.G. ("Bulk (Zug)") and defendant Sun International Ltd. ("SIL") for a supply of North Sea crude oil. Also named as defendants are Sun Company, Inc. ("Sunoco"), Sun Oil Trading Company ("SOTC") and Sun International, Inc. ("SII"). Occasionally we may refer to the defendants collectively as "Sun".

Plaintiff claims that SIL's refusal to deliver the oil contracted for violated section 1 of the Sherman Act, the Export Administration Act, and the Racketeer Influenced and Corrupt Organizations Act. In addition, plaintiff seeks recovery for defendants' alleged wrongful attachment of property of an affiliate of plaintiff, Bulk Oil (Milano) S.r.l. Defendants move to dismiss all claims. As many of the facts of this case have been reported in the Interim Award of the Arbitrator in London dated October 8, 1982 (which is annexed as Exhibit A to the Complaint), we will not restate them here, but will develop them in our discussion of the various points of defendants' motion.

## I. Antitrust Claim

Plaintiff alleges that defendants' refusal to deliver the oil violated section 1 of the Sherman Act. Specifically, plaintiff alleges that the defendants' refusal to deliver constituted a combination and conspiracy "to comply with, further, and support the Arab Boycott of Israel by refusing to deliver crude oil contracted for by plaintiff and similarly situated companies for delivery to Israel". Complaint ¶ 71. We grant defendants' motion to dismiss this claim because we find defendants' refusal to deliver was neither a "refusal to deal" nor a boycott. We further find we lack subject matter jurisdiction over this claim, and that the Act of State doctrine precludes adjudication of this claim.

■ The contract between Bulk (Zug) and SIL called for SIL to deliver "certain quantities of United Kingdom North Sea crude oil for the price and in accordance with the terms set forth in that contract". Complaint ¶ 35. As the Arbitrator's Interim Award indicates, the contract contained a "Destination Clause" which read:

Destination Free but always in line with exporting country's Government policy. United Kingdom Government policy, at present, does not allow delivery to South Africa.

Interim Award at ¶ 34. As the Arbitrator further found, in 1981, U.K. Government policy "precluded the direct export of North Sea crude to Israel". Id. at ¶ 53. Bulk Zug's nomination of Haifa as the oil's destination thus constituted a breach of contract that relieved SIL of its obligations under the agreement. Id. at ¶¶ 61, 148. See also Final Award at ¶ 7. SIL's refusal to deliver the oil therefore was a lawful exercise of its rights under the law of contract, not a violation of the antitrust laws.

■ Even if SIL's failure to deliver the oil could be construed as a boycott or refusal to deal for the purposes of the antitrust statute, we find we lack jurisdiction to hear this claim under National Bank of Canada v. Interbank Card Association, 666 F.2d 6 (2d Cir.1981). In Interbank, the Second Circuit stated that the proper test of jurisdiction in cases alleging extraterritorial violations of the antitrust laws was "whether the challenged restraint has, or is intended to have, any anticompetitive effect upon United States commerce, either commerce within the United States or export commerce from the United States". Id. at 8. In stating this test, the Second Circuit specifically rejected the Ninth Cir-

cuit's test for jurisdiction in such cases as stated in *Timberlane Lumber Co. v. Bank of America N.T. & S.A.*, 549 F.2d 597 (9th Cir.1977).[1] *Timberlane's* test, the Second Circuit noted, could "lead unwarrantedly to an assertion of jurisdiction whenever the challenged conduct is shown to have some effect on American foreign commerce, even though the actionable aspect of the restraint, the anticompetitive effect, is felt only within the foreign market in which the injured plaintiff seeks to compete". *Id.*

In this case, plaintiff has alleged the following effects in the Complaint at paragraph 73:

(a) the flow of crude oil in the foreign trade and commerce of the United States has been burdened by the defendants' compliance with Arab Boycott;

(b) the availability of crude oil in the United States has been affected by defendants' compliance with the Arab boycott;

(c) plaintiff has been deprived of the benefits of free and open competition; and

(d) plaintiff has been injured in its business by defendants' compliance with the Arab Boycott.

Paragraph 73(b), (c) and (d) do not state effects sufficient to confer subject matter jurisdiction under *Interbank* since none of them allege anticompetitive effects on United States commerce. Read alone, paragraph 73(a) appears to be a sufficient statement of anticompetitive effects, but we find this conclusion undercut by other information contained in the complaint. As a preliminary matter, the transaction in question here was a contract between a Swiss company (¶ 4) and a Bermuda corporation (¶ 6) to deliver North Sea oil (¶ 35) to

an Israeli customer (¶ 56). The suppliers of the oil were Swedish (¶¶ 20, 58) and British (¶¶ 20, 60). These facts alone suggest a most tenuous connection to United States commerce. More significantly, however, defendants' non-delivery of the oil to plaintiff in fact resulted in eight of thirteen cargoes being delivered to the United States. ¶ 54. As counsel conceded at oral argument, the net result of defendants' non-delivery was to increase the supply of crude oil in the United States, and thus the actual effect in the United States was procompetitive. On this record, we cannot conclude that subject matter jurisdiction exists under *Interbank's* standard.

Plaintiff does not elaborate upon any of these alleged effects in its papers in opposition to this motion. Rather, it argues that jurisdiction is proper under *Interbank* because the anticompetitive effects of a group boycott are presumed as a matter of law, citing *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (which cites, in turn, *Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941)). *Northern Pacific* and *Fashion Originators' Guild* do state that group boycotts are *per se* violations of the antitrust laws, not subject to a rule of reason analysis. They do not say, however, that any boycott, anywhere, is presumed to have anticompetitive effects in the United States.[2]

We also find that plaintiff's claim raises substantial Act of State problems that render adjudication inappropriate. The Act of State doctrine precludes judicial inquiry into "the validity of the public acts of a recognized foreign sovereign power committed within its own territory". *Banco Nacional de Cuba v. Sabbatino*, 376

---

1. *Timberlane* set a "tripartite test of (1) a restraint affecting or intended to affect foreign commerce of the United States, (2) a restraint of sufficient magnitude to 'present a cognizable injury' to the plaintiff, and (3) the propriety of asserting extraterritorial jurisdiction as a matter of international comity and fairness." *Interbank,* 666 F.2d at 8.

2. Neither *Northern Pacific* nor *Fashion Originators* would seem to have the occasion to produce such a holding. *Northern Pacific* was actually a tying case; its reference to group boycotts appears in a string cite of cases that held certain practices *per se* violations. *Fashion Originators* was a boycott case, but the boycott does not appear to have extended beyond United States borders.

U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). In this case, the contract between Bulk and Sun was specifically pegged to "U.K. policy". U.K. policy, as stated by the British Secretary of State for Energy, precluded direct sales of North Sea oil to Israel. Interim Award at ¶¶ 40–48. To hold defendants in violation of the United States antitrust laws would thus seem to require an inquiry into the validity of official British policy. This is precisely the type of inquiry the Act of State doctrine is supposed to bar.

Plaintiff argues that the Act of State doctrine should not apply here because the British ministers' statements do not constitute formal governmental acts. Plaintiff cites the following language from *Dominicus Americana Bohio v. Gulf & Western Industries*, 473 F.Supp. 680, 689 (S.D.N.Y. 1979) in support of its argument:

> In order to trigger application of the act of state doctrine, the government act concerned must be a public one such as *legislative enactment, regulatory decree,* or executive use of the police powers.

(emphasis supplied by plaintiff). It is not entirely clear to us that U.K. policy as expressed by Secretaries of State in response to inquiries by members of Parliament does not constitute "executive use of the police powers", mentioned in *Dominicus*, but not underscored by plaintiff. At any rate, the use of the phrase "such as" in the quoted passage suggests that the listing was not intended to be exhaustive.[3]

The more relevant inquiry appears to be whether the defendants' acts were compelled by the acts of a foreign sovereign. *See Timberlane*, 549 F.2d at 606[4] (quoting *Intramerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1298

(D.Del.1970) ("When a nation compels a trade practice that firms there have no choice but to obey, acts of business become effectively acts of the sovereign")). With respect to this point, plaintiff asserts that the U.K.'s policy did not compel defendants' refusal to deliver crude oil to plaintiff since "defendants were always free to supply plaintiff with oil from a source other than the North Sea". Memo in Opp. at 35. Inasmuch as plaintiff alleges in its complaint, however, that the contract was one for the sale of "certain quantities of United Kingdom North Sea crude oil", ¶ 35, it would appear defendants had no obligation under the contract to do so.

Plaintiff also asserts that the defendants were not bound by the U.K. policy because the policy was enforced only sporadically. However, plaintiff undercuts the strength of this argument with its statement: *"So long as violations were not made blatantly public,* noncompliance was largely ignored by the United Kingdom's Department of Energy". Memo in Opp. at 34. Yet it was precisely plaintiff's nomination of Haifa that made the noncompliance attempted here public, and that disabled the defendants from performing.

For all these reasons, therefore, we grant defendants' motion to dismiss plaintiff's antitrust claim.

## II. *Export Administration Act Claim*

■ Bulk also claims that Sun's refusal to deliver the oil contracted for violated the antiboycott provisions of the Export Administration Act, 50 U.S.C.App. § 2407 et seq. (Supp. III 1979). Sun argues (1) that no private right of action exists under this statute, and (2) even if one does, the statute was not violated. We agree that no private right of action exists under the

---

**3.** Indeed, the Supreme Court has defined the doctrine as applying to "public acts a recognized foreign sovereign power committed within its own territory", *Banco Nacional de Cuba*, 376 U.S. at 401, 84 S.Ct. at 926, and "acts done within their own States, in the exercise of governmental authority". *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). *See Alfred Dunhill of London, Inc. v.*

*Republic of Cuba*, 425 U.S. 682, 706, 96 S.Ct. 1854, 1866, 48 L.Ed.2d 301 (1976).

**4.** In *Interbank*, the Second Circuit expressly declined to "question [ ] the pertinence of" *Timberlane*'s test of "international comity and fairness" as a prerequisite for the exercise of extraterritorial jurisdiction. 666 F.2d at 8. (See note 1, *supra*.)

Export Administration Act, and grant defendants' motion to dismiss this claim.

The Export Administration Act of 1979 ("the Act") directs the President or his delegate to issue regulations prohibiting certain actions taken with intent to comply with, further, or support a foreign boycott. 50 U.S.C.App. § 2407. Violators are subject to criminal and civil penalties and administrative sanctions pursuant to § 11 of the Act. *Id.* § 2410(a)–(c). Actions for the recovery of penalties may be brought in the name of the United States. *Id.* § 2410(f). The statute does not contain any reference to a private right of action to enforce its substantive provisions. Since the statute clearly lacks an express private right of action, the question this motion presents is whether one may be implied.

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) set out four factors to be considered in determining whether a private remedy is to be inferred under a statute not expressly providing for one:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

More recent cases have indicated that the greatest weight is to be given to the second factor, congressional intent. *E.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982). *Merrill Lynch* further counsels that "the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perceptions of the law that it was shaping or reshaping." At 378.

At this point, a review of the history of the Act may be helpful. The Act was first adopted in 1949. The original statute was directed at controlling the export of materials in short supply and with "potential military significance". 63 Stat. 7 (1949). The Act allowed the President to promulgate regulations prohibiting the exportation of designated materials. *Id.* § 3. Violations were punishable by fine and/or imprisonment. *Id.* § 5.

In 1965, the Act was amended to add a statement that it was the policy of the United States to oppose restrictive trade practices or boycotts. P.L. 89–63, 79 Stat. 209 (1965). The President was given authority to promulgate appropriate regulations to implement this policy. The 1965 amendments added civil penalties in addition to the penal sanctions contained in the 1949 Act. The new civil penalty sections read as follows:

> (c) The head of any department or agency exercising any functions under this Act, or any officer or employee of such department or agency specifically designated by the head thereof, may impose a civil penalty not to exceed $1,000 for each violation of this Act or any regulation, order, or license issued under this Act, either in addition to or in lieu of any other liability or penalty which may be imposed.

> (d) The payment of any penalty imposed pursuant to subsection (c) may be made a condition, for a period not exceeding one year after the imposition of such penalty, to the granting restoration, or continuing validity of any export license, permission, or privilege granted or to be granted to the person upon whom such penalty is imposed.

> (e) Any amount paid in satisfaction of any penalty imposed pursuant to subsection (c) shall be covered into the Treasury as a miscellaneous receipt. The head of the department or agency concerned may, in his discretion, refund any such penalty, within two years after payment,

on the ground of a material error of fact or law in the imposition. Notwithstanding section 1346(a) of title 28 of the United States Code, no action for the refund of any such penalty may be maintained in any court.

(f) In the event of the failure of any person to pay a penalty imposed pursuant to subsection (c), a civil action for the recovery thereof may, in the discretion of the head of the department or agency concerned, be brought in the name of the United States. In any such action, the court shall determine de novo all issues necessary to the establishment of liability. Except as provided in this subsection and in subsection (d), no such liability shall be asserted, claimed, or recovered upon the United States in any way unless it has previously been reduced to judgment.

(g) Nothing in subsection (c), (d), or (f) shall limit—

(1) the availability of other administrative or judicial remedies with respect to violations of this Act or any regulation, order, or license issued under this Act,

(2) the authority to compromise and settle administrative proceedings brought with respect to violations of this Act or any regulation, order, or license issued under this Act, or

(3) the authority to compromise, remit, or mitigate seizures and forfeitures pursuant to section 1(b) of title VI of the Act of June 15, 1917 (22 U.S.C. 401(b)).

In 1976, there was an effort to amend the Act further. A bill that passed the House contained an explicit private right of action for treble damages:

A United States person aggrieved by action taken as a result of a violation of section 4(k)(2) of this Act may institute a civil action in an appropriate United States district court, without regard to the amount in controversy, and may recover threefold actual damages, reasonable attorney's fees, and other litigation costs reasonably incurred, and obtain other appropriate relief.

H.R. 15377, 94th Cong., 2d Sess., § 6(g) (1976). The companion Senate version of the same legislation did not contain a comparable provision, however. *See* S. 3084, 94th Cong., 2d Sess. (1976) No final version was adopted that year.

In 1977, a new bill without the treble damage provision was introduced and passed in both the House and the Senate. P.L. 95–52, 91 Stat. 235 (1977). The 1977 amendments were specifically aimed at taking a "stronger stand" on the problem of the Arab boycott of Israel and its impact on United States business. The 1977 amendments thus added a new section requiring the President to issue rules and regulations prohibiting any United States persons from:

taking or knowingly agreeing to take any of the following actions with intent to comply with, further or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States: (A) Refusing, or requiring any other person to refuse, to do business with or in the boycotted country, ... or with any other person pursuant to an agreement with, ... or a request from or on behalf of the boycotting country....

The 1977 amendments further added as an administrative sanction the revocation of export licenses for violation of the anti-boycott provisions.

In 1979, the amendments of 1977 were incorporated without change into the Export Administration Act of 1979. *See* H.R. Rep. No. 200, 96th Cong., 1st Sess. 3 (1979); P.L. 96–72, 93 Stat. 521 (1979).

Two things strike us as significant in the mass of otherwise unenlightening legislative history of the Export Administration Act. First, as far as our research can determine, it appears that no one has ever attempted to bring any sort of private action under this statute since its adoption in 1949. As follows from this, of course, no court has ever judicially recognized a private right of action under the Act. Against this background, the second point that we deem significant is Congress' fail-

ure to adopt an amendment providing for a private right of action as proposed in the House in 1976.

Plaintiff argues, citing *Leist v. Simplot,* 638 F.2d 282 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), that Congress' failure to adopt the private right of action provision proposed in 1976 should not be viewed as evidence of an intent to deny a private right of action since the 1976 proposal also contained a provision for treble damages. We find this case distinguishable from *Leist,* however. *Leist* considered the question of whether a private right of action existed under the Commodity Exchange Act ("CEA") as amended in 1974. In concluding that such a right did exist, Judge Friendly noted "one differentiating factor of ... transcendent importance": that judicial decisions prior to the 1974 amendments had uniformly upheld the existence of a private right of action, and the 1974 Congress was well aware of the existing state of the law. 638 F.2d at 303. It was this factor that led Judge Friendly to reject arguments by the defendants and the dissent that Congress' failure to enact bills that had provided for a private right of action for treble damages evidenced a Congressional intent to deny a private right of action. Since a private right of action for simple damages already existed under the CEA, the failure to adopt a treble damage provision could only be construed as an intent to deny treble damages. *See* 638 F.2d at 315 n. 38.

In this case, however, no comparable history of judicial implication of a right exists. Unlike *Leist,* and like *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* ("*Amtrak*") 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) Congress *was* "operating on a *tabula rasa*", 638 F.2d at 313, when it revised and amended the Export Administration Act. While Congress' failure to enact a private right of action for treble damages in this case is not as strong of evidence of intent to deny a private right of action as was Congress' rejection of a provision pro-

viding for suits by any "aggrieved person" in *Amtrak,* we believe this case is closer to *Amtrak* than it is to *Leist.*

Plaintiff further argues that a private right of action should be inferred on the basis of section 11(g) of the Act, 50 U.S.C. App. § 2410(g) (Supp. III 1979). This section provides:

(g) Other authorities

Nothing in subsection (c), (d) or (f) limits—

(1) the availability of other administrative or judicial remedies with respect to violations of this Act [sections 2401 to 2420 of this Appendix], or any regulation, order, or license issued under this Act [sections 2401 to 2420 of this Appendix]:

(2) the authority to compromise and settle administrative proceedings brought with respect to violations of this Act [sections 2401 to 2420 of this Appendix]; or

(3) the authority to compromise, remit or mitigate seizures and forfeitures pursuant to section 1(b) of title VI of the Act of June 15, 1917 (22 U.S.C. 401(b)) [section 401(b) of Title 22].

"Subsection (c), (d) or (f)" as appears in subsection (g) refers to the civil penalty sections added in 1965 (and quoted at page 8, *supra* ). Plaintiff argues that the phrase "or judicial remedies" should be construed as providing for a private right of action under the Act. While we believe such a reading of this section is literally possible, we find this interpretation inconsistent with the history and structure of the Act.

The legislative history of the 1965 amendments does not contain the slightest suggestion that a private right of action was intended by adoption of section (g). The discussions of the proposed provisions rather indicate an intention to increase regulatory flexibility. We thus believe the more reasonable reading of subsection (g) is that it confirms that the presence of civil penalties in subsections (c), (d), or (f) in no

way limited the *government's* choice of sanctions or actions to enforce the Act.

In hearings on the 1965 amendments, John Connor, Secretary of Commerce, testified before the Committee on Banking and Currency that the "amendment will add some much-needed flexibility to the enforcement of the act, by enabling us to impose an appropriate monetary sanction in certain types of cases for which existing sanctions are not well suited". Continuation of Authority for Regulation of Exports: Hearings Before the Committee on Banking and Currency; 89th Cong., 1st Sess. 5–6 (1965). Later in those same hearings, Secretary Connor further expounded upon the civil penalty amendments:

Mr. Cabell. For the record, Mr. Secretary, on page 4 of your testimony you refer to repeated minor violations not warranting cancellation of the license.

Now, are we jockeying ourselves into a position by just imposing a fine to where it would be profitable for the violator just to pay those fines if he is not threatened with cancellation of his license? I have seen that happen in other matters where it is profitable just to go ahead and pay the fine.

Secretary Connor. Mr. Cabell, our intent would be to handle a few repeated minor violations after the warning letter with some kind of a civil fine after the procedure that was discussed, but if the offenses continue, then there is no reason at all why we can't proceed to the more serious type of penalties, and this would be our intent. This proposal, in other words, would just give us a broader range of arms in the arsenal.

Mr. Cabell. It is not just a wrist-slapping thing. You will retain that action.

Secretary Connor. Yes, sir.

*Id.* at 26–27. *See also* H.R.Rep. No. 434, 89th Cong., 1st Sess. 4–5 (1965).

In addition, the legislative history of the 1965 amendments indicates a keen desire on the part of Congress to spell out precisely those powers granted by the amendments, and a reluctance to leave important matters to "implication". Thus, the Senate report on H.R. 7105 contains the following statement:

Section 2 of the bill amends section 5 of the act to authorize the administrative imposition of a civil penalty not exceeding $1,000 for any violation of the act or any regulation, order, or license issued under it. The bill differs from the bill originally proposed by the Department of Commerce in two major respects. First, the Commerce Department bill would have left to legal implication the power to collect a fine by means of the administrative sanction of withholding or suspending export licenses or privileges until the fine is paid. Under existing law, licenses may be revoked for any infraction, and the imposition of a fine would normally be a milder sanction. *However, the legal power to confront an offender with the alternative of either paying the monetary penalty or losing his license is too important a feature of the statutory scheme to be left to implication.* It is also desirable to limit to a maximum of 1 year the period for which export privileges may be withheld as a means of collecting a penalty. The monetary penalties authorized by this bill are not intended to deal with serious and flagrant violations.

The other major change from the original proposal in the civil penalty provisions is to clarify the rights of persons who wish to contest in court the imposition of any such penalty. In the case of a person who does not pay the penalty, either voluntarily or to prevent the suspension of his export privileges, the bill provides that the Government may collect only by a civil action in which the court is to determine de novo all issues necessary to the establishment of liability. *It is possible that the courts might have reached this result under the language of the originally proposed bill providing that the "amount of any penalty * * * shall be recoverable in a civil suit in the name of the United States," but this is by no means certain.*

Senate Rep. No. 363, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Adm.News 1826, 1831 (emphasis added). Certainly one would think that a private right of action is at least as important to the statutory scheme as "the legal power to confront an offender with the alternatives of either paying the monetary penalty or losing his license", and, if intended, would have similarly "not be[en] left to implication".

■ The Export Administration Act sets forth a detailed regulatory scheme for enforcement of its provisions. "A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage to subsume other remedies". *Amtrak*, 414 U.S. at 458, 94 S.Ct. at 693. We believe this principle is applicable here. Finding no legislative intention to provide a private right of action under the Export Administration Act, we grant defendants' motion to dismiss this claim.

## III. The RICO Claim

Plaintiff's fourth claim alleges a violation by defendants SOTC and SIL[5] of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (1976). Defendants move to dismiss the claim on the grounds that plaintiff has failed to allege a connection on their part to "organized crime", and has failed to allege an injury from "racketeering activity".

RICO makes it unlawful for any person to engage in certain "racketeering activities" or to conspire to do so. 18 U.S.C. § 1964 provides for civil remedies. Section 1964(c) provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover the threefold damages he sustains and the cost of the

suit, including a reasonable attorney's fee.

Congress' self-declared purpose in enacting RICO was "to seek the eradication of organized crime in the United States". *United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981) (quoting 84 Stat. 923). On the basis of the statute's legislative history, several judges in this district have concluded that a complaint under the civil provisions of RICO must allege a link between the defendants and organized crime. *See, e.g., Minpeco, S.A. v. Conticommodity Services, Inc.*, 558 F.Supp. 1348, 1351 (S.D.N.Y. 1983) (Lasker, J.); *Noonan v. Granville-Smith*, 537 F.Supp. 23, 29 (S.D.N.Y.1981) (Knapp, J.); *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109, 113 (S.D.N.Y.1975) (MacMahon, J.). *Contra, Hellenic Lines v. O'Hearn*, 523 F.Supp. 244, 247 (S.D.N.Y.1981) (Duffy, J.). Although we have no doubt that Congress did not intend "to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties", *Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347, 1361 (S.D. N.Y.1983), we are reluctant to read an "organized crime" requirement into the civil statute given the constitutional problems that would be raised by such a requirement in the criminal context. *See Bankers Trust Co. v. Feldesman*, 566 F.Supp. 1235 at 1240 (S.D.N.Y.1983) (available on Lexis, Genfed library, Dist file) (citing 116 Cong. Rec. 35204 (1970) (remarks of Congressman Poff). We also note the problems inherent in the task of defining "organized crime". *Cf. Minpeco, S.A.* 558 F.Supp. at 1351. ("It is unnecessary to attempt at this point to specify a definition of organized crime. Minpeco has not alleged any link between the defendants and organized crime, by any definition.")

■ We do agree with defendants, however, that to state a claim for damages under civil RICO, a plaintiff must do more than simply allege performance of at least

---

**5.** The complaint uses the general term "defendants" in discussing the RICO violation (*see, e.g.,* ¶ 87), however, no mention of defendant SII appears in allegations made with respect to that claim.

two predicate acts listed at 18 U.S.C. § 1961(1) within a ten year period. Section 1964(c) grants standing to any person injured "by reason of a violation of section 1962 of this chapter". "Unless these words have no effect, they can only mean that the plaintiff's injuries must derive from the 'pattern of racketeering activity' which violates section 1962 rather than directly from the underlying acts which combine to constitute that pattern." *Bankers Trust Co.*, at 1240–41. *See also Richardson v. Shearson/American Express Co.*, 573 F.Supp. 133, Fed.Sec.L.Rep. (CCH) ¶ 99,145 at 95,525–26 (S.D.N.Y.1983); *Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347, 1361 (S.D.N.Y.1983). We thus consider whether plaintiff has alleged an injury "by reason of a violation of section 1962".

Section 1962 provides in relevant part:
Prohibited activities

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest to, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce. . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Plaintiff has not alleged any injury by virtue of section 1962(a). That is, plaintiff has not claimed that it was injured by defendants' investment of any income derived from their alleged "pattern of racketeering activity".[6] Nor has plaintiff alleged injury through a violation of section 1962(b) —the acquisition of an interest in any enterprise through a pattern of racketeering activity. The determination of whether plaintiff has alleged injury by virtue of section 1962(c), however, requires a more detailed analysis of that section's terms.

Section 1962(c), by its terms, applies to "persons" who are "employed by or associated with any enterprise" and who participate in the conduct of that enterprise's affairs "through a pattern of racketeering activity". "Persons" under RICO include individuals and entities capable of holding interests in property. 18 U.S.C. § 1961(3). An "enterprise" under the statute includes:

any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

As can be seen, section 1962(c) "clearly envisions a relationship between a 'person' and an 'enterprise' as an element of the offense which [it] proscribes and for which 1964(c) would subject the 'person' to treble damages". *Van Schaik v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1136 (D.Mass.1982). *See also Bennet v. Berg*, 685 F.2d 1053, 1061 (8th Cir.1982); *Eaby v. Richmond*, 561

---

**6.** A "pattern of racketeering activity" under the statute is "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity". 18 U.S.C. § 1961(5). A "racketeering activity" is one of the many predicate acts (which include extortion as alleged in this complaint) set forth at 18 U.S.C. § 1961(1).

F.Supp. 131, 134 (E.D.Pa.1983); *Parnes v. Heinold Commodities, Inc.*, 549 F.Supp. 20, 23–24 (N.D.Ill.1982). *But cf. United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983) (corporation may be both criminal defendant and enterprise); *D'Iorio v. Adonizio*, 554 F.Supp. 222, 232–33 (M.D.Pa.1982) (enterprise may be named a civil defendant when alleged to have been operated by directors and controlling partners through a pattern of racketeering activity).

█ In this case, plaintiff has not made clear in its complaint who is the person sought to be held liable for participating in the conduct of what enterprise. Indeed, it appears that plaintiff considers "person", "enterprise", and "pattern of racketeering activity" all to be synonymous for the purposes of the statute. We do not believe such a loose reading of the statute is warranted, particularly when the potential for abuse of the statute in light of its purpose is considered. More significantly, however, we find that as pleaded, the complaint does not state a claim of injury from violation of section 1962(c) no matter who is considered the person or the enterprise. If, for example, one considers SOTC and SIL collectively "the enterprise", then plaintiff has named no person employed by or associated with that enterprise whose conduct caused them injury. Alternatively, if one considers SOTC as the enterprise and SIL the person "associated with" SOTC, then plaintiff has not pleaded a *"pattern* of racketeering activity" on SIL's part since SIL is alleged to have participated in only one predicate act, namely, the wrongful attachment of Bulk (Milano)'s property. Finally, if SIL is the enterprise and SOTC the person, plaintiff has not alleged SOTC's "participation . . . in the conduct of such enterprise's affairs *through* a pattern of racketeering activity" since, again, SOTC apparently acted alone in ordering oil from Bulk (USA) without the intention of paying. As was explained in *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981):

one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise, or (2) the predicate offenses are related to the activity of that enterprise. Simply committing predicate offenses which are unrelated to the enterprise or one's position within it would be insufficient.

Finally, plaintiff has not stated a claim of injury under section 1962(d) since it does not allege any conspiracy to violate sections (a), (b) or (c).

### IV. The Wrongful Attachment Claim

As we have indicated to the parties in our letter of August 8, 1983, we are unable to decide defendants' motion to dismiss this claim without briefing on the issues of which jurisdiction's law applies, and whether plaintiff's claim is legally sufficient under that law. Accordingly, we defer decision on this point pending receipt of further briefs on these issues.

### V. Summary

Plaintiff's claims under the Sherman Act, the Export Administration Act and RICO are dismissed. Decision on plaintiff's wrongful attachment claim is deferred as indicated in section IV above.

SO ORDERED.

### SUPPLEMENTAL OPINION

In our decision dated August 11, 1983, we dismissed three of four claims asserted in the complaint. As to the remaining claim for wrongful attachment, we asked the parties to submit supplemental briefs on the issues of which jurisdiction's law applies and whether plaintiff's claim is legally sufficient under that law. These briefs having been submitted, we consider those issues herein.

The Third Claim of plaintiff's complaint asserts a claim "for damages inflicted on Bulk Zug by defendants' wrongful attachment of the property of Bulk Oil (Milano)

S.r.l., an affiliate of the plaintiff". As amplified by the pleadings in a related case brought by Bulk Oil (Milano), 83 Civil 742 (CES),[1] which are attached to the complaint, the claim is that defendants obtained orders of sequestration or attachment from Italian courts directed to crude oil of Bulk Zug. However, the crude oil which was attached thereafter was the property of Bulk Milano. Plaintiff seeks damages for this wrongful attachment.

■ In determining which law applies, we look in this diversity action to New York's conflict of law rules. The New York test has been described as one of "governmental interest analysis", *Clark v. Celeb Publishing, Inc.*, 530 F.Supp. 979, 982 (S.D.N.Y.1981); *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). Here, Bulk Zug, a Swiss corporation, sues for damages resulting from orders of attachment issued by Italian courts against property in Italy which was owned by Bulk Milano, an Italian company. Under the New York rule, it seems clear that the law of Italy is applicable.

It is alleged that SOTC has its principal place of business in Pennsylvania. Plaintiff asserts that the decision to attach the oil was made in Pennsylvania and hence the law of Pennsylvania is applicable. We disagree. The claimed wrongful conduct was the use of Italian law and Italian courts to seize property of an Italian company. As indicated above, Italian law is the appropriate law to apply.

■ The applicable law appears to be Article 96 of the Italian Code of Civil Procedure.[2] This provides as follows:

If it appears that the losing party has asserted his claim or denied another par-

ty's claim with bad faith or gross negligence, the judge, upon application of the successful party, will sentence the losing party to pay not only the costs of the proceedings but also the damages suffered by the successful party which he will assess in the judgment.

The judge who ascertains the nonexistence of the right for which the attachment was enforced or a mortgage was recorded or executory proceedings were commenced or prosecuted, upon application of the damaged party, will adjudicate the party that obtained the attachment to restore the damages when the plaintiff acted without due diligence. The damages will be assessed as in the first part of this provision.

Defendants were seeking the attachment here in issue in connection with an arbitration proceeding in London between the parties in which Bulk Zug was the losing party. Under Article 96 only "the successful party" may assert a claim for wrongful attachment. Moreover, as both experts agree, a claim for damages for wrongful attachment must be asserted in the attachment proceeding itself (and so may not be asserted here). Finally, according to defendants' expert, plaintiff's claim would be rejected under Italian law as too remote a consequence of the attachment. That is, since the oil belonged not to Bulk Zug but to Bulk Milano and Bulk Zug's claim is based on Bulk Milano's failure to pay for the oil, an Italian court would find that Bulk Zug's damages were not related to the attachment.[3]

Plaintiff now asserts that the cause of action, although expressly labelled one for wrongful attachment, is in fact one for intentional interference with contract, that is, that defendants intentionally had tor-

---

1. By decision dated August 11, 1983, defendants' motion to dismiss this action on the grounds of *forum non conveniens* was granted.

2. The experts on Italian law of both plaintiff and defendants agree that, since the attachment occurred in Italy, an Italian court would apply Italian law.

3. We are advised by counsel that the Italian court has ordered the release of the bonds posted by Bulk Milano, has declared that the oil was the property of Bulk Milano and that the attachment was wrongful, and has dismissed Bulk Zug's claim for damages, since Bulk Zug was not a "successful party" under Article 96. Incidentally, defendants' contention that this holding is *res judicata* is not without merit.

tiously interfered with the performance of the contract under which Bulk Milano purchased oil from plaintiff. It is further contended that, as a result of the attachment, Bulk Milano could not resell the oil to obtain funds to pay plaintiff therefor. This belated effort to change the thrust of the third claim is not persuasive. The pleadings are clear on their face as to the nature of the claim. But even if we were to construe the plain language to state a claim for tortious interference with contract, it fails to state a claim. The orders of attachment were obtained, according to the Bulk Milano complaint, on October 27 and October 28, 1981. The orders were served on October 31, 1981 and, it is alleged, on that date defendants became aware that the oil belonged to Bulk Milano and not Bulk Zug. Accordingly, defendants could not have been acting improperly with respect to a contract of which they had no knowledge when they obtained the orders. Indeed even under Pennsylvania law, if it were applicable, there would be no claim stated, since that law requires that the defendant must have acted with the purpose of interfering with plaintiff's contract. *Birl v. Philadelphia Electric Co.,* 402 Pa. 297, 300–1, 167 A.2d 472 (1960).[4]

We conclude that Italian law applies and that under Italian law plaintiff has not stated a cause of action in the Third Claim. Accordingly, the Third Claim and the complaint are dismissed.

SO ORDERED.

---

**4.** In *Engine Specialties, Inc. v. Bombardier Limited,* 605 F.2d 1, 19, (1st Cir.1979), the court refers to Pennsylvania law as requiring interference "with the known contract".