**NATIONAL BANK OF CANADA,**
**Plaintiff-Appellant,**

v.

**INTERBANK CARD ASSOCIATION and**
**Bank of Montreal,**
**Defendants-Appellees.**

**No. 804, Docket 80–9122.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1981.

Decided Feb. 20, 1981.

Walter L. Stratton, New York City (Richard Y. Holcomb, G. Russell Miller, David S. Versfelt, and Donovan, Leisure, Newton & Irvine, New York City, on the brief), for plaintiff-appellant National Bank of Canada.

Harry L. Shniderman, Washington, D. C. (Bingham B. Leverich, Arvid E. Roach, II, Pierre J. Schlag, Michael A. Roth, and Covington & Burling, Washington, D. C., Frank H. Gordon, Thomas C. Junker, and Rogers, Hoge & Hills, New York City, on the brief), for defendant-appellee Interbank Card Association.

John Dickey, New York City (William M. Dallas, Jr., Daniel D. Caldwell, and Sullivan & Cromwell, New York City, on the brief), for defendant-appellee Bank of Montreal.

Before TIMBERS and NEWMAN, Circuit Judges, and PLATT,* District Judge.

TIMBERS, Circuit Judge:

Appellant National Bank of Canada ("National Bank") sought an injunction to prevent appellees Interbank Card Association ("Interbank") and Bank of Montreal ("BOM") from carrying out their decision to terminate National Bank's "Master Charge" credit card business. National Bank and BOM are two of Canada's eleven banks. Interbank licenses banks and other financial institutions to operate Master Charge businesses through the issuance of Master Charge credit cards, the extension of credit to cardholders, and the processing and exchange of sales paper of participating merchants. The district court, Leonard B. Sand, *District Judge*, after a bench trial, in a reasoned opinion, 507 F.Supp. 1113, dismissed the complaint with prejudice at the close of appellant's case on the ground that no evidence had been introduced that could support appellant's claims of violation of its rights under the Sherman Act and under the contracts governing relations among the parties. From the judgment entered on Judge Sand's opinion, this appeal was taken. We affirm the judgment although we do so on other grounds in part.

I.

National Bank is the result of the amalgamation on November 1, 1979 of two Canadian banks, Provincial Bank and Banque Canadienne Nationale. Provincial Bank had formed a joint venture with BOM in 1973 to introduce the Master Charge system in Canada. Provincial Bank and BOM obtained identical licenses from Interbank to use the Master Charge trademark and the various services of Interbank. In the license agreements Interbank guaranteed the two Canadian banks that it would license no Canadian competitors for the

---

* Hon. Thomas C. Platt, United States District Judge, Eastern District of New York, sitting by designation.

first five years of their operation. During the next four years, through December 31, 1981, Provincial and BOM each were given veto powers over the entry of new competitors other than United States companies or Canadian subsidiaries of United States companies. The license agreements prohibited sublicensing and assignment.

The attempt of BOM and Interbank to enforce the nonassignment provisions of the license gives rise to the present action. Interbank decided that, under the license agreement and the Interbank by-laws, Provincial was barred from transferring its license and membership to its successor, National Bank. However, Interbank stated that it would issue a new license to National Bank, if, but only if, BOM did not veto the application. BOM stated that it would approve the license only if National Bank disposed of the "Visa" card business it had inherited from its other predecessor, Banque Canadienne Nationale. National Bank was unsuccessful in its attempt to sell its Visa card business at a price acceptable to it. Upon National Bank's failure to meet BOM's conditions for withholding a veto of the new license application, Interbank issued a resolution, at BOM's request, terminating National Bank's participation in the Interbank system.

## II.

As to appellant's claims under the Sherman Act, the threshold question is jurisdictional: whether the extraterritorial reach of the Act extends to the alleged restraint. The district court applied the analysis outlined in *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9 Cir. 1977), and concluded that jurisdiction was established under *Timberlane's* tripartite test of (1) a restraint affecting or intended to affect foreign commerce of the United States, (2) a restraint of sufficient magnitude "to present a cognizable injury" to the plaintiff, and (3) the propriety of asserting extraterritorial jurisdiction as a matter of international comity and fairness. *Id.* at 613.

■ Without questioning the pertinence of the third test identified in *Timberlane*, we conclude that the separate identification of the first two tests may lead unwarrantedly to an assertion of jurisdiction whenever the challenged conduct is shown to have some effect on American foreign commerce, even though the actionable aspect of the restraint, the anticompetitive effect, is felt only within the foreign market in which the injured plaintiff seeks to compete. Building upon the fundamental "effects" test outlined by Judge Learned Hand in *United States v. Aluminum Company of America*, 148 F.2d 416 (2 Cir. 1945), we think the inquiry should be directed primarily toward whether the challenged restraint has, or is intended to have, any anticompetitive effect upon United States commerce, either commerce within the United States or export commerce from the United States. *See* 1 Areeda & Turner, Antitrust Law § 234b, at 255 (1978). To us the critical factor in deciding this case is that appellants have not shown that enforcement of the exclusivity provision of the license agreement is at all likely to have an anticompetitive effect upon American commerce, either foreign or interstate.

■ Our jurisdiction is not supported by every conceivable repercussion of the action objected to on United States commerce. Only those injuries to United States commerce which reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation constitute effects sufficient to confer jurisdiction. *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977). While the anticompetitive effects must be shown to outweigh any procompetitive effects in order to establish liability, there must be at least *some* anticompetitive effects to meet the threshold requirement of jurisdiction.

■ The action complained of is the termination by appellees of appellant's membership in Interbank and the revocation of appellant's right to use the Master Charge trademark, pursuant to the exclusivity and non-assignability provisions of appellant's

license agreement. Appellant urges that this action, which will exclude it from competition for Canadian credit cardholders and merchant accounts, constitutes a restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Therefore, the important question for us is whether the termination of appellant as a Master Charge bank in Canada can be foreseen to have any appreciable anticompetitive effects on United States commerce. While we do not say that such effects could not occur, they do not appear from the record before us.

The exclusion of one firm from a market obviously increases the concentration of other firms in that market. The possible anticompetitive result of increased concentration of a market is an increase in the bargaining power of the firms in that market over the persons with whom they deal.

Assuming that, at the time the district court was presented with the question of whether it had jurisdiction, it had no knowledge of the likely impact on competitive conditions in relevant geographic and product markets, we do not see that enforcement of the agreement posed a foreseeable threat to United States commerce of a type sufficient to justify assertion of jurisdiction. If we assume that the elimination of appellant as a bank in the credit card business would greatly increase the concentration of that business, and that the increased concentration would result in merchants having to pay higher fees on their accounts, the anticompetitive effect on United States commerce still does not appear. No doubt payment of increased fees by merchants would decrease their profitability; but decreased profitability of Canadian merchants is not a proper concern of the United States and appellant has not shown that any significant number of United States firms doing business in Canada clear credit card sales paper through Canadian banks or, if they do so, that they are unable to turn to United States banks for that service.

The district court also might have hypothesized that increased concentration of credit card bankers in Canada would cause a decrease in the number of Canadian credit cardholders. The anticompetitive effect of a decline in the number of Canadian cardholders on United States commerce, however, is not clear. The district court pointed out that many Canadian cardholders use their cards to purchase goods and services in the United States from time to time. Yet, we have no basis for assuming, and appellant has not claimed, that these purchases would not be made on cash terms, or on other credit terms, if, due to the enforcement of appellant's license agreement, credit cards were unavailable to some of these purchasers.

A relevant inquiry is whether Interbank, the only American actor clearly involved in this action, and the business with which it is concerned, would be adversely affected if we do not permit the assertion of jurisdiction. Perhaps the simplest answer to that question is that Interbank is a defendant in this action and presumably is acting in its self-interest.

In short, appellant has failed to make clear the linkage, if any, between the behavior objected to and any anticompetitive consequences to United States commerce.

### III.

As to appellant's contract claims, we affirm the judgment of the district court substantially for the reasons set forth in the opinion of Judge Sand dated December 16, 1980.

Affirmed.