**LIAMUIGA TOURS, a DIVISION OF CARIBBEAN TOURISM CONSULTANTS LTD., Plaintiff,**

v.

**TRAVEL IMPRESSIONS, LTD., Defendant.**

**No. CV 84–0468.**

United States District Court, E.D. New York.

Sept. 18, 1985.

Robert M. Gottschalk, P.C. by Sidney N. Weiss, New York City, for plaintiff.

Cooperman, Levitt & Winikoff, P.C., New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Liamuiga Tours, a division of Caribbean Tourism Consultants, Ltd., (Liamuiga Tours) is incorporated under the laws of St. Kitts and is located solely on St. Kitts. Defendant Travel Impressions, Ltd. (Travel Impressions) is a New York corporation with its principal place of business in New York. Plaintiff is in the travel and tourist business, providing local charters, travel services and tourist information, and tour packages locally on St. Kitts. Defendant is a bulk wholesale tour operator for the Caribbean, including St. Kitts, providing travel and tour packages. Defendant books or charters planes, contracts for ground transport and activities, and books blocks of hotel rooms. These travel packages are sold through retail travel agents. For a period from 1981 to 1983 plaintiff was a "Destination Service Operator"

(DSO), or local representative, for defendant on St. Kitts. A third player, not a party to this action, is the Royal St. Kitts Hotel (Hotel), the largest and most modern hotel with the best facilities and amenities on the island. It has over twenty-five percent of the approximately 500 hotel rooms on St. Kitts.

St. Kitts, or St. Christopher, is a Caribbean island formerly part of the British colony of St. Kitts-Nevis-Anguila, and now part of the federation of St. Christopher and Nevis. It is a small island and not one of the most popular Caribbean vacation spots. The "season" for St. Kitts, which is to say the heavy tourist trade period, is from December to the following April, also known as the winter season. Under the terms of a contract entered into on December 29, 1981, plaintiff became defendant's representative, or DSO, on St. Kitts for the 1981–1982 season. Defendant continued to engage plaintiff's services either by an amendment that expired at the end of the next season in April 1983 or by a superseding contract that was terminated by defendant in October and November of 1983. Plaintiff sues defendant for anti-trust violations (first cause of action), breach of contract (second cause of action), and interference with business relationships (third cause of action), alleging total damages of $1,650,000.00, including treble damages for anti-trust. Defendant now moves to dismiss the anti-trust cause of action for failure to state a claim on which relief can be granted, Rule 12(b)(6), and for summary judgment on the other two causes of action, Rule 56(b), Fed.R.Civ.P. Defendant further contends that the amount in controversy necessary for diversity jurisdiction, 28 U.S.C. § 1332(a), over the state law claims is less than $10,000.00 and asks for dismissal for lack of subject matter jurisdiction. Rule 12(h), Fed.R.Civ.P. Alternatively, defendant asks for dismissal of the entire action based on *forum non conveniens*.

## I.

In December 1981 Travel Impressions engaged Liamuiga Tours as its DSO on St.

Kitts for the 1981–1982 season. Liamuiga Tours was to meet and greet the Travel Impressions clients, arrange transport, arrange activities, and generally be an available and helpful source of information and services. This specifically included running hospitality desks for Travel Impressions customers in the Royal St. Kitts Hotel and several other hotels. It is undisputed that Travel Impressions lodged eighty percent of its clients at the Royal St. Kitts Hotel and that it brings in about eighty percent of the U.S. "package tour passengers" coming to St. Kitts. In addition, plaintiff was allowed to sell local tour packages to defendant's patrons and retain all profits.

Defendant continued plaintiff's services for the 1982–1983 season, either by a one-season term amendment to the original one-season contract or by superseding contract with no set expiration, a factual issue disputed by the parties. In December 1982, however, the Hotel refused to allow plaintiff to operate a hospitality desk on its premises. The reasons are uncertain. Either the Hotel wanted compensation for the use of its premises, did not want tour representatives operating there, took a dislike to the head of Liamuiga Tours, Makeda Mikael, or found Ms. Mikael to be rude and arrogant to both Travel Impressions customers and other guests. In any event, the reasons are not relevent at this point. Another Liamuiga Tours representative was allowed to be of service to Travel Impressions clients without the use of a hospitality desk, and defendant and plaintiff continued to negotiate with the Hotel for reinstatement of the desk.

In February 1983 relations with the Hotel were further strained when a snowstorm in the United States closed airports and stranded departing tourists in St. Kitts for two days. A dispute arose as to whether the vacationers or Travel Impressions would pay for the extra stay at the Hotel, with confusion as to what representations Liamuiga Tours had made. At the end of February a fire at the Hotel caused it to close down until September 1983, thereby suspending the hospitality desk controversy.

During the off-season of 1983 plaintiff apparently continued to perform full DSO duties for Travel Impressions. According to the plaintiff, in November 1983 the Hotel informed Travel Impressions that it wanted nothing more to do with plaintiff and threatened to cancel Travel Impressions' bookings if it continued plaintiff as its representative (Affidavit of Makeda Mikael ¶ 20(x)). In any event, by letter of October 12, 1983 and telex of November 9, 1983 defendant declared that it was ending or not renewing its DSO relationship with plaintiff. Liamuiga Tours instituted a suit against the Hotel in St. Kitts and commenced the action against Travel Impressions in this Court.

## II.

■ Plaintiff's first and third causes of action allege violations of the Sherman Act, 15 U.S.C. §§ 1, 2, and ask damages under the Clayton Act, 15 U.S.C. § 15.

As a first cause of action plaintiff alleges restraint of trade by defendant and an anti-competitive conspiracy with a non-party co-conspirator to monopolize the tourist business in St. Kitts and between the United States and St. Kitts (Complaint ¶¶ 22–24). Plaintiff asks for treble damages under § 4 of the Clayton Act. 15 U.S.C. § 15. Defendant moves to dismiss the anti-trust claims for failure to state a claim on which relief can be granted. Rule 12(b)(6), Fed.R. Civ.P. In view of the affidavits and exhibits presented the motion may properly be converted to one for summary judgment. Rules 12(b)(7), 56(b), Fed.R.Civ.P.

Travel Impressions contends that the anti-trust laws are inapplicable as there is no anti-competitive effect on a United States market. Defendant is correct that a domestic market must be affected in either interstate commerce or commerce between the United States and a foreign country.

The effects test was first articulated in *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945). In that seminal case Judge Learned Hand con-

cluded that Congress did not intend for the Sherman Act "to punish all whom its courts can catch for conduct which has no consequences within the United States." *Id.* at 443 (citations omitted). Judge Hand discussed the ramifications of an anti-competitive agreement in international commerce and concluded that whatever the intent, such an agreement is not covered by our anti-trust laws "unless its performance is shown actually to have had some effect" on American imports and exports. *Id.* at 444.

The federal courts have differed in their application of the effects test. Plaintiff would have this Court use the test outlined by the Ninth Circuit in *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir.1977). Nevertheless, the controlling case in this Circuit is *National Bank of Canada v. Interbank Card Association,* 666 F.2d 6 (2d Cir.1981). In that case the Second Circuit Court of Appeals held that there must be an appreciable anti-competitive effect on this country's commerce of a type sufficient to justify assertion of jurisdiction. *Id.* at 9. The Second Circuit explicitly rejected the Ninth Circuit's tripartite test in *Timberlane Lumber Co.,* 549 F.2d at 613. *National Bank of Canada,* 666 F.2d at 8. Specifically, the Second Circuit asserted that the first two elements of the test, intended or actual effect on United States foreign trade and cognizable injury to a plaintiff, allowed an unwarranted extension of jurisdiction to cases where the anti-competitive effect was limited to a foreign market. *Id.* Under the Second Circuit's standard, anti-competitive agreements formed within or without the United States must cause actual injury to domestic commerce to confer jurisdiction.

Long discussion of the case law, while enlightening, is not necessary. In 1982, the year after the Second Circuit's decision in *National Bank of Canada,* Congress addressed the issue of extraterritorial application of the Sherman Act. The resulting legislation amended the Act to provide:

§ 6a. Conduct involving trade or commerce with foreign nations.

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a (1982). There is as yet little case law interpreting § 6a and the Court must resort to the legislative history contained in the House Report on the measure. H.Rep. No. 686, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad. News 2431, 2487.

The amendment had two stated purposes. First, Congress sought to ease the business community's anxiety caused by their perception that anti-trust laws were a hindrance to export ventures. This aspect of the 1982 amendment is of no concern here. Second, Congress sought to clarify the test for determination of United States anti-trust jurisdiction in international commerce. The House Report listed the subtle variations of the effects test articulated by various courts. Calling for a single, objective standard, Congress chose a test that "makes the Sherman Act inapplicable to conduct involving trade or commerce with foreign nations, other than import transactions, unless there is a '*direct, substantial, and reasonably foreseeable effect* ' on domestic or import commerce or the export

opportunities of a domestic person." *Id.* at 3, *reprinted in* U.S.Code Cong. & Ad.News at 2488 (emphasis added). Moreover, the Report explained that the effect required for jurisdictional nexus must be an anti-competitive effect in the domestic market. *Id.* at 11–12, *reprinted in* U.S.Code Cong. & Ad.News at 2496–97. In sum, the amendment adopts the stricter effects test of *National Bank of Canada.*

Analysis of the facts in this case quickly reveals that plaintiff has lost business on St. Kitts. Taking the allegations of the complaint as true, Liamuga Tours has lost a pool of nearly guaranteed customers for its own charters and tourist packages, as well as the income from the contract with Travel Impressions. Barring Liamuiga Tours from the Royal St. Kitts Hotel makes it a markedly less attractive DSO for every travel agency or tour operator needing such services on St. Kitts. It could effectively exclude plaintiff from the DSO market completely and substantially from the local charter market, albeit indirectly. Nonetheless, the situs of these effects, however considerable, is St. Kitts. It matters not if there was anti-competitive conduct in the United States or by domestic corporations. *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F.Supp. 1102 (S.D.N.Y. 1984). The consequences suffered by plaintiff are limited to St. Kitts. Accordingly, these effects do not establish a jurisdictional nexus.

Nevertheless, plaintiff argues that the American market suffers anti-competitive effects from plaintiff's exclusion from the DSO market in St. Kitts. Liamuiga Tours maintains that there is less competition among DSO's and consequent higher costs to American travel agents, and their clients, booking tours to St. Kitts. In short, plaintiff claims that there is an anti-competitive effect on American businesses engaged in the "export" of tourist groups to St. Kitts. The issue is whether this is an anti-competitive effect on businesses within the United States and whether it is a substantial, direct, and reasonably foreseeable effect. 15 U.S.C. § 6a(1)(B).

The argument that the domestic market affected is tour packagers boomerangs in an odd fashion. It is defendant Travel Impressions, not the plaintiff, that suffers the anti-competitive consequences. For it is Travel Impressions that will find itself with fewer DSO's competing for its business. The lesser competition supposedly will result in higher DSO costs to defendant, which it must absorb or pass on, making its St. Kitts packages either less profitable or less attractive. In effect, plaintiff's argument is that defendant by excluding plaintiff is causing an anti-competitive effect on defendant. If Liamuiga Tours were suing the Royal St. Kitts Hotel in anti-trust, the domestic market effects argument would not have this absurd twist. Plaintiff seeks to escape it by asserting that the persons suffering the anti-competitive effect are American consumers of Caribbean tour packages. Nevertheless, it remains that the entities suffering any possible direct anti-competitive effect are the travel agencies. Moreover, they all suffer the same effect and none gains a competitive advantage in the St. Kitts travel market. Insofar as St. Kitts becomes less attractive in the larger market encompassing packaged tours to all Caribbean vacation areas, the travel agent most dependent on St. Kitts business is adversely affected.

Once again taking the plaintiff's allegations as true, apparently defendant is the package tour operator most dependent on St. Kitts business. According to Ms. Mikael's affidavit, Travel Impressions is the only wholesale or bulk tour operator to St. Kitts and is the only user of a DSO (Mikael Affidavit ¶ 10). Defendant brings in about eighty percent of the "bulk and non-bulk" package tour passengers (Aff. ¶ 10). Defendant's passengers arrive by the "planeload full," and the remaining twenty percent of the package tour visitors are the clients of a few independent travel agents and non-bulk operators (Aff. ¶ 10).

The Court will not belabor the factual analysis. It is clear from plaintiff's allegations that defendant is the only "market" for DSO's on St. Kitts and controls the

lion's share of the St. Kitts package tour market in the United States. It is equally clear that there is no evidence whatsoever that this is the result of anti-competitive practices. Furthermore, eliminating plaintiff from the DSO market has not been shown to have any direct, substantial, or reasonably foreseeable effect on competition among United States tour operators for the Caribbean or St. Kitts. Plaintiff has surely been cut out of the St. Kitts DSO market, although more likely at the behest of the non-party Hotel than the defendant. While the effects in St. Kitts are substantial, at best domestic consequences are speculative.

Therefore, under 15 U.S.C. § 6a and *National Bank of Canada v. Interbank Card Assoc.*, 666 F.2d 6 (2d Cir.1981), there is no jurisdictional nexus for this Court to decide the claim under the Sherman Act, and the first cause of action is dismissed.

There remains the third cause of action for interfering with plaintiff's business relationships. The specific facts supporting the claim are not stated. It is unclear what relationships with whom suffered interference, and where, when, and how they suffered it. As plaintiff alleges violation of New York common law as a basis for the Complaint, the Court presumes that this third cause is partly based on that theory. But plaintiff also reiterates the anti-trust and contract law violations of the first and second causes of action as bases for this cause.

■■■ Insofar as plaintiff invokes the anti-trust laws of this country, they are inapplicable to the claim for interference in business relationships for the reasons discussed earlier. Insofar as plaintiff invokes this state's common law, and contract law in particular, plaintiff has failed to allege with the minimum particularity any facts in support of the claim. Moreover, plaintiff has failed to plead any basis for the application of New York law to this cause of action. Accordingly, the third cause of action is dismissed without prejudice.

### III.

Plaintiff's second cause of action is for breach of contract. Travel Impressions moves for summary judgment on the ground that the only agreement it had with plaintiff expired of its own accord on April 21, 1983 and defendant was under no obligation to renew its contractual relationship with Liamuiga Tours. Defendant offers the original contract for the 1981–1982 season, executed on December 29, 1981 by Ms. Mikael and by Mr. McDonnell for Travel Impressions (Defendant's Exhibit B), and the amendment extending the original contract through April 21, 1983 (Defendant's Exhibit C), which was executed on April 27, 1982. Both the original contract and the 1982 amendment provide for a basic per head payment of $4.00 for the off season, or summer, and a $250.00 per week flat rate for the high season for various escort and assistance services. The 1982 amendment varies the payment term slightly by pegging the flat rate in the winter season to a sixty-two passenger minimum. The original contract has a number of other provisions, among which are a $7.00 per person fee for airport-hotel transport (Defendant's Exhibit B, ¶ 4), operation of hospitality desks, (¶ 1(g)), retention by Liamuiga Tours of commissions earned on sale of local tours and entertainment (¶ 5), and a provision for one month's notice of termination (¶ 3). The 1982 amendment does not vary these terms, it only extends the time and modifies the payment term.

Plaintiff counters with a document on Travel Impressions letterhead entitled "Destination Service Operator Agreement" (DSO Agreement) (Plaintiff's Exhibit 2 and Defendant's Exhibit D). This document is seven pages long, contrasted with the three page original contract, and is far more detailed as to the services and responsibilities that the parties undertake. It sets out the costs charged to each party and how they should be billed. Finally, it is signed by defendant on December 29, 1982 and plaintiff on January 7, 1983. It does not provide for the rate of compensation or a term of duration, terms that are set out in the original contract and modified by the 1982

amendment. Plaintiff claims that this alone constitutes its agreement with defendant and it does not expire as of April 21, 1983. Defendant claims that this document is a DSO manual only and does not constitute an agreement between the parties.

Plaintiff, through the affidavit of Ms. Mikael, narrates the various services provided by plaintiff from the spring to the fall of 1983, including news on the Royal St. Kitts' reconstruction, other local information of interest, arrangements for a September visit by Travel Impressions personnel, and continued services to arriving Travel Impressions clients (Mikael Affidavit ¶ 20(i-vii) ). This is supported by copies of correspondence from the summer and early fall that evidence defendant's continuing amicable dealings with Liamuiga Tours as defendant's DSO on St. Kitts (Plaintiff's Exhibits 5-9).

Plaintiff also contends that the DSO contract was renewed in September 1983. Liamuiga Tours maintains that when the code of certain telexes is correctly interpreted the telexes indicate the contract renewal. A copy of a telex received by Travel Impressions at the end of September 1983 is particularly useful on this point (Defendant's Exhibit F). The Court does not pretend to make a definitive interpretation of its meaning at this juncture, however, the text appears to read: "Re infor[mation] for p[rogram] manual. Should we mail or abbreviate and telex. Please also advise Brad re contract renewal." This would indicate that Liamuiga Tours is providing earlier requested information for defendant's manual update (*see* Plaintiff's Exhibit 7). Plaintiff argues that the telex conveys the information that the contract has been renewed. Defendant contends that it is a query as to when or whether renewal is forthcoming. Tellingly, there is a handwritten note on the telex: "9/28—Di—Pls. obtain the k she sent up.—Brad." A reasonable reading of this notation is that Brad Tolkin of Travel Impressions wanted his assistant to find the renewal contract that Ms. Mikael had signed and sent.

Again, the Court is not definitively interpreting the import of the notation.

On October 12, 1983 the Executive Vice President of Travel Impressions, Ira Theodore, wrote a letter to Ms. Mikael (Defendant's Exhibit G) captioned "Winter 1984 Representation Service," declaring that defendant would not engage Liamuiga Tours' services for the "winter 1984 season," citing the conflict between plaintiff and the Royal St. Kitts Hotel as the reason. By telex of November 9, 1983 (Plaintiff's Exhibit 10) Denis McDonnell of Travel Impressions informed Ms. Mikael: "I am sorry to inform you that Royal St. Kitts Hotel insist you cease operations from [sic] both fàll and winter. It is unfortunate but you realize my hands are tied in this matter." This ended the DSO relationship between the parties.

Plaintiff contends that the apologies conveyed in defendant's missives ending their dealings definitively bespeak termination, not failure to renew. While the language does not clearly evidence breach of contract, the facts raise a number of issues. Initially, there is an issue as to whether the DSO Agreement constitutes a contract between the parties and what terms it imposes, specifically whether it extends the term of the parties' agreement beyond April 21, 1983. Next, are the issues of whether the contract was renewed or extended to include the 1983–1984 season, either by the actions and course of dealings of the parties after April 1983, or by a renewal agreement signed and delivered by Ms. Mikael.

That the document entitled "Destination Service Operator Agreement" is on its face an agreement between the parties is beyond doubt. The document is titled as an agreement. Its closing paragraph declares, "T.I. would appreciate your acknowledgement and confirmation by telex at your earliest convenience. Additionally, please sign and return a copy of this agreement, and maintain a copy for your records" (Defendant's Exhibit D, p. 7). The document is signed and dated by both parties. Clearly, the document impressed

Ms. Mikael as bearing on rights and obligations between the parties as she added a modification under the signatures noting Liamuiga Tours' limited ability to operate within the Royal St. Kitts Hotel, then signed and dated the modification. It is incredible to contend that a document detailing duties and obligations, denominated an agreement, and executed at the request of the party that now seeks to disavow it is a mere manual.

As this action concerns "a written contract defendant drafted and executed in New York for services to be partly performed in New York" (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, p. 19), it would appear that New York contract law applies. That law clearly holds that where two or more written instruments between the same parties concerning the same subject matter are contemporaneously executed, they will be read and interpreted together. *E.g., Evans Products Co. v. Decker,* 383 N.Y.S.2d 457, 459, 52 A.D.2d 991 (3d Dep't 1976). In this instance, however, some eight months elapsed between the 1982 amendment extending the original contract (Defendant's Exhibit C) and the execution of the DSO Agreement (Defendant's Exhibit D). This emphatically does not make these contemporaneously executed instruments. Yet the agreements do not conflict, for the DSO Agreement elaborates on duties and procedures outlined in the original agreement and is silent as to the payment and duration terms set forth in the original and the 1982 amendment. On the evidence now before it, the Court is inclined to read the three instruments as forming a consistent, single agreement. Nevertheless, the interpretation of these three instruments is subsidiary to the larger issues of whether a contract existed between the parties in the fall of 1983 and whether it was breached. Therefore, it is inadvisable for the Court to definitively construe the three documents without deciding the larger issues.

The original agreement, its 1982 amendment, and the DSO Agreement are not the only possible bases for finding that a contract existed between the parties. It is recognized that after an agreement expires by its own terms an implied contract can arise when the parties continue to perform as before. 22 N.Y.Jur.2d *Contracts* § 203 (1982). From the affidavits and documents submitted as part of the summary judgment motion, it could be reasonably inferred that the parties by their conduct had mutually assented to an extension of the original contract. In addition, there is the contention that Ms. Mikael signed and delivered a contract renewal in October 1983. That document and any supporting factual information, aside from the one telex (Defendant's Exhibit F), are not now before the Court, rendering summary judgment on the existence of a contract particularly inappropriate.

Furthermore, unless the existence of an agreement and its terms are established, it is futile to discuss the issue of breach. In addition to the duration, payment, and termination terms, the contract provision for a hospitality desk or DSO presence on the Hotel premises is material to the question of breach. Neither party has fully addressed that point as yet.

Accordingly, the existence of a contract after April 1983, whether it was breached, what damages were suffered, and whether, in the absence of a contract, money is nonetheless owing for services rendered by the plaintiff are all factual questions genuinely disputed and unsuited to summary judgment. *Adickes v. Kress & Co.,* 398 U.S. 144, 157–60, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970). Therefore, Travel Impressions' motion for summary judgment on the cause of action for breach of contract is denied.

### IV.

The Court has dismissed the antitrust and business interference claims but has not disposed of plaintiff's contract action, which arises under state law. The parties acknowledge that the state claim properly remains before this Court as diversity of citizenship exists between plaintiff and defendant. 28 U.S.C. § 1332(a)(2).

Travel Impressions, however, contends that the $10,000.00 amount in controversy required for subject matter jurisdiction is lacking, 28 U.S.C. § 1332(a), and moves for dismissal pursuant to Rule 12(h), Fed.R. Civ.P.

Defendant argues that contrary to Liamuiga Tours' prayer for relief in the amount of $450,000.00 for breach of contract, the claim is worth no more than the value of the contract for one season, that is either the $2,700.00 flat payment provided in the contract or the $3,700.00 paid to plaintiff's replacement for the 1983–1984 season. Plaintiff counters that whatever the flat fee contract term was, in fact total fees paid to Liamuiga Tours by Travel Impressions were $8,700.00 in 1981, $25,-150.00 in 1982, and $11,000.00 in 1983 (Mikael Affidavit ¶ 24). More importantly, plaintiff asserts that it has lost the commissions and fees from entertainment, excursions, and other tourist activity arrangements and packages put together by Liamuiga Tours and sold to interested Travel Impressions clients on St. Kitts. As noted earlier, the contract between the parties explicitly allowed Liamuiga Tours to retain all commissions earned on its independent sales of tourist packages to defendant's patrons. Obviously, Travel Impressions' DSO is the first contact for defendant's clients and likely to be their first source when searching out vacation activities on St. Kitts. Moreover, there was no apparent prohibition against plaintiff's active solicitation of Travel Impressions customers. As DSO, then, Liamuiga Tours had an almost guaranteed clientele for services outside its contract with Travel Impressions. According to the affidavit of Ms. Mikael, this amounted to "many times" the annual sums paid by Travel Impressions (Aff. ¶ 24).

The controlling Supreme Court case on the issue of jurisdictional amount is *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). After first observing that the courts should rigorously enforce the congressional intent to restrict diversity jurisdiction by requiring a substantial sum in controversy, the Court set out the rule for dismissal:

> [T]he sum claimed by the plaintiff controls if the claim is made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

*Id.* at 288, 58 S.Ct. at 590. The Court explained that recovery of less than the jurisdictional amount or the allegation of a valid defense do not destroy federal jurisdiction. Rather, a court must be satisfied to a legal certainty that the plaintiff was never entitled to recover the amount claimed.

The courts have differed in their application of the rule in the *St. Paul Mercury Indemnity* case. Some courts have applied it so as to require that a challenge to the sum claimed puts the burden on the plaintiff to show that the claim survives the legal certainty test. *E.g., Taylor v. Sandoval*, 442 F.Supp. 491, 494 (D.Colo.1977). Other courts have apparently left the burden on the defendant to show that it is a legal certainty that the claim cannot amount to the jurisdictional minimum or was made in bad faith. *E.g., LeBlanc v. Spector*, 378 F.Supp. 301, 306 (D.Conn. 1973). Nevertheless, a prolonged discussion of the law and facts is not necessary, nor are the burdens so onerous. In a not so recent case, apparently overlooked by counsel, the Second Circuit Court of Appeals has neatly summed up the application of *St. Paul Mercury Indemnity*. In *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir.1982), the Court of Appeals particularly stressed the wisdom of not delving into the comparative merits of a case when deciding the issue of jurisdictional amount. For to require real proof of claimed relief quickly takes a court into adjudication of facts and weighing of legal merits. The *Zacharia* Court laid out the rule thusly:

> Although diversity jurisdiction depends upon the amount in controversy exceeding $10,000, jurisdiction is not lost because a plaintiff's ultimate recovery is less than that amount. The jurisdictional

determination is to be made on the basis of the plaintiff's allegations, not on a decision on the merits. Moreover, even where those allegations leave grave doubt about the likelihood of recovery of the requisite amount, dismissal is not warranted.... Rather, it must appear to a legal certainty from the complaint that the plaintiff cannot recover sufficient damages to invoke federal jurisdiction.... We have allowed, however, resort to materials developed in discovery to be used to amplify the meaning of the complaint allegations.

*Id.* at 202 (citations omitted).

While plaintiff has not put forward detailed support for its breach of contract claim of $150,000.00 in the Complaint, it has shown previous annual earnings from the contract in excess of $10,000.00. There is no indication that earnings would have been less for the 1983–1984 season had the DSO relationship continued. Nor has the defendant rebutted the presumption in favor of plaintiff's allegation. Travel Impressions has merely pointed to the flat rate provision of the contract and asserted that that was all it was worth. Not only does that fail to include the off-season per capita rate, it ignores the almost certain independent commission earnings reaped by a moderately enterprising DSO. The Court, however, is skeptical of plaintiff's claim for $300,000.00 in "foreseeable consequential damages." Damages for breach of contract are generally limited to compensatory damages. 36 N.Y.Jur.2d *Damages* § 32 (1984). And they must be shown to flow naturally and directly from the breach. *Id.* §§ 20, 25. Remote, indirect, speculative, or conjectural losses are not recoverable. *Id.* §§ 13, 14, 108. Nevertheless, while at this time there is little apparent support for the alleged $150,000.00 in actual damages and $300,000.00 in consequential damages, defendant has not shown that there is a legal certainty that plaintiff is not entitled to damages in excess of $10,000.00 for breach of contract.

Defendant's motion to dismiss for lack of subject matter jurisdiction is denied. Plaintiff is granted leave to amend the complaint, if necessary, as to damages. Of course, should it at any time appear certain that plaintiff has no factual or legal basis for pleading damages in excess of $10,-000.00 on its state claim, penalties might be appropriate. *See* Rule 11, Fed.R.Civ.P.

### V.

■ Finally, defendant asks that this action be dismissed on the ground of *forum non conveniens.* As the Court has dismissed plaintiff's anti-trust and business interference claims, examination of the *forum non conveniens* issue is restricted to the remaining cause of action for breach of contract. Dismissal of the anti-trust claim may alter the parties' interests and views on the appropriateness of this forum. It certainly dispenses with the argument of the inapplicability of the doctrine of *forum non conveniens* to anti-trust actions. *Industrial Investment Development Corp. v. Mitsui & Co., Ltd.,* 671 F.2d 876 (5th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 393, 78 L.Ed.2d 337 (1984).

Suits between citizens of different countries separated by significant distances present more than the usual venue difficulties. Often none of the possible forums is ideal. The doctrine of *forum non conveniens,* though the ancestor of the statute for transfer of venue based on inconvenience, 28 U.S.C. § 1404(a), is not identical to it and survives the 1948 enactment of that law. *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955). Under *forum non conveniens* there is less judicial discretion and the remedy is the harsh one of dismissal. *Id.,* 75 S.Ct. at 546. For in determining the issue a court decides whether it should decline to exercise jurisdiction in an instance where it has jurisdiction and venue. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504–07, 67 S.Ct. 839, 841–42, 91 L.Ed. 1055 (1947).

Initially there is a question as to whether state law or federal law governs the doctrine in diversity cases. In *Gilbert,* a diversity action in New York federal court, the United States Supreme Court avoided

deciding which law controlled by observing that federal and New York law were the same. *Id.* at 509, 67 S.Ct. at 843. More recently, the Second Circuit Court of Appeals also found no significant difference between the two. *Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir.), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). Accordingly, this Court need not decide between state and federal law, as they apparently do not conflict.

In *Gulf Oil Corp. v. Gilbert*, the Supreme Court laid out the considerations a court must address under *forum non conveniens*. The underlying principle is that the plaintiff's choice of forum should not be disturbed unless the balance of factors strongly favors the defendant. 330 U.S. at 508, 67 S.Ct. at 843. The analysis is one of the ease and efficiency of litigation in the chosen forum. Inherent in the analysis is the concern that the particular court has been chosen to make trial a vexatious, harrassing, and expensive experience for the defendant. As the Second Circuit Court of Appeals has pointed out, however, improved technology, transportation, and communication since the *Gilbert* decision have altered the analysis of such factors as expense, accessibility, availability, and convenience. *Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 65 (2d Cir.1981) (quoting *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring)).

In *Gilbert* the Supreme Court divided the factors to be considered into categories of private and public interest. Important private interests of the litigants are ease of access to sources of proof, availability of compulsory process, the cost of attendance for witnesses and parties, enforceability of judgment, and other factors bearing on the ease, expeditiousness, and expense of trial. 330 U.S. at 508, 67 S.Ct. at 843. Factors of public interest are perhaps less weighty and include congestion of the forum's docket, *but see Calavo Growers of California v. Generali Belgium*, 632 F.2d at 969 (Newman, J., concurring), the inappropri-

ateness of asking jurors to try a case with no connection to their community, the preference for having a home forum decide the law governing the case, and the interest in having localized controversies decide where they arose. *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508–09, 67 S.Ct. at 843. This last consideration is likely the most important public interest factor. For when the locality of the court is not where the cause of action arose, has little direct involvement or interest in its outcome, and is connected to the litigation only by virtue of minimal contacts amounting to just enough to bestow jurisdiction and venue, the doctrine of *forum non conveniens* makes it particularly appropriate for the court to decline jurisdiction.

Turning to the case at hand, the Court notes that many of the *forum non conveniens* factors are not addressed by either party. Moreover, the parties' discussion largely concerns trial of the defunct antitrust claims and is irrelevant to the breach of contract claim. Addressing the private interest factors, the Court first examines the accessibility and availability of witnesses and documents. Travel Impressions is concerned primarily with witnesses on St. Kitts, especially certain of the Hotel's personnel, and the documentary evidence in the hands of the Hotel and plaintiff. Defendant cites possible problems in obtaining discovery and testimony from sources on St. Kitts. Liamuiga Tours counters that two of the Hotel managers defendant names as potential witnesses have left the island, and represents that it will make available to defendant the persons and papers under its control, including what it obtains in its local litigation against the Hotel.

Much if not all of the documentation of the contract should be in defendant's possession. Most likely any witnesses in St. Kitts that are necessary to the defense will have to be produced for the plaintiff's case at trial. Liamuiga Tours must certainly produce Ms. Mikael, who as its principal signed the DSO contracts. In short, for plaintiff to make its case at trial it must

produce much of the evidence defendant apparently seeks. Failure to allow pre-trial discovery of the evidence would, of course, result in sanctions under Rule 37, Fed.R. Civ.P., including striking of pleadings and precluding introduction of the evidence. Neither side has discussed the availability of compulsory process on St. Kitts or the usefulness of letters rogatory. *See* 28 U.S.C. §§ 1781, 1782.

The cost of defending the action would appear to be lower in this forum. Plaintiff has consented to bear the cost of pursuing its case in New York by filing in this Court. Further, defendant has not put forth a clear factual basis for its assertion that it will be less costly for it to appear in St. Kitts and develop its defense there. It is clear that a New York judgment against Travel Impressions will be enforceable. It is not clear that a St. Kitts judgment will be enforceable. Nor has defendant represented that it will submit to the jurisdiction of a St. Kitts court and guarantee satisfaction of any judgment against it. *See Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d at 150, 159. In sum, at this stage the parties have not presented complete arguments on the private interest factors under *forum non conveniens* or developed the facts beyond mostly speculative assertions. This is in part attributable to their concentration on the anti-trust claims. As yet, there is little to show that trial in this Court is vexatious and unduly expensive for defendant, particularly as the plaintiff has filed in Travel Impressions' home forum. *Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d at 67.

The Court is even less enlightened by the parties' arguments on the public interest factors. That New York law governs the remaining claim is a given for the parties. Plaintiff asserts the proposition at one point and defendant nowhere contradicts it. On the face of it, there are contacts sufficient to support jurisdiction in New York and application of its law to the contract. The contract was drafted, partly executed, and partly performed within the state. It follows that as the case concerns a New York citizen, and apparently New York

law, the community has an interest in its resolution. And as there is a substantial nexus between the contract controversy and the Eastern District of New York, the size of this Court's docket is a negligible factor. In short, there is no public interest reason for dismissing this action under *forum non conveniens*.

In conclusion, the record is inadequate for the Court to make a sound analysis and final decision on *forum non conveniens*. The interests so far presented to the Court, however, do not balance against allowing plaintiff its choice of forum, particularly when it is defendant's home forum. Both New York and St. Kitts courts have drawbacks and a well-reasoned determination requires comparative evaluation of both their advantages and obstacles. As it stands, defendant has not shown that it will be easier and fairer to try this case in St. Kitts. *Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d at 65. Furthermore, the Court suspects that the parties may reassess their forum preferences in light of dismissal of the anti-trust claims. There is no bar to a future motion to dismiss for *forum non conveniens*, if it appears appropriate. At this juncture, however, defendant's motion to dismiss for *forum non conveniens* is denied.

## VI.

The Court concludes that it lacks jurisdiction to hear the anti-trust claim. Defendant's motion for summary judgment is granted as to the plaintiff's first cause of action, and the anti-trust claim is hereby dismissed.

The Court next concludes that there are genuine issues of material fact as to the second cause of action for breach of contract. Summary judgment is, therefore, inappropriate. Accordingly, defendant's motion is denied. The Court rules that it retains subject matter jurisdiction over the contract claim based on diversity of citizenship and concludes that such jurisdiction does not fail for an inadequate amount in controversy. Nevertheless, plaintiff is

granted leave to amend the Complaint with respect to damages.

The Court further concludes that plaintiff has not pleaded sufficient facts or law to support a claim for interference with business relationships. Whether or not there is ground for a state law claim, it is certain that there is no basis for the claim under anti-trust law. Accordingly, the third cause of action is dismissed without prejudice and with leave to renew by amendment to the Complaint within sixty days from the entry of this decision.

Finally, defendant's motion for dismissal based on *forum non conveniens* is denied.

SO ORDERED.