Charlotte KRUMAN, Charles Tabachnick, Mortab Limited, individually and on behalf of class of persons similarly situated, Sophie McGee, Timothy Stothert, and Robert W. Burkle, Plaintiffs-Appellants,

and

Maggs Bros. Ltd. and Nicola Smith, Plaintiffs,

v.

CHRISTIE'S INTERNATIONAL PLC, Christie's Inc., Sotheby's, Inc., Sotheby's Holdings, Inc., Christopher M. Davidge, A. Alfred Taubman, Diana D. Brooks, Christopher J. Burge, Stephen S. Lash, Patricia G. Hambrecht, Dan-

iel P. Davison, Francois Curiel, Max M. Fisher, Michael L. Ainslie and Kevin A. Bousquette, Defendants-Appellees,

and

Anthony Tennant, Defendant.

Docket No. 01-7309.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 2001.

Decided March 13, 2002.

York, NY (Michael D. Hausfeld, Ann C. Yahner, Paul T. Gallagher, Cohen Milstein Hausfeld & Toll, P.L.L.C., Washington, D.C.; Robert A. Skirnick, Maria A. Skirnick, Meredith Cohen Greenfogel & Skirnick, P.C., New York, NY; David J. Bershad, Michael M. Buchman, Ryan E. Long, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York, NY; Karen L. Morris, Seth D. Rigrodsky, Morris and Morris, Wilmington, DE, on the brief), for Plaintiffs–Appellants.

Steven Alan Reiss (A. Paul Victor, Howard B. Comet, Christopher V. Roberts, Gary G. Pelletier, on the brief) Weil, Gotshal & Manges LLP, New York, NY, for Defendants–Appellees Sotheby's, Inc. and Sotheby's Holdings, Inc.

Shepard Goldfein (Michael L. Weiner, Clifford H. Aronson, Peter S. Julian, Thomas Pak, Cyrus Amir–Mokri, on the brief) Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants–Appellees Christie's Inc., Christie's International PLC and Daniel P. Davison.

Carey R. Dunne, Michael Patrick, Benjamin Means, Davis Polk & Wardwell, New York, NY, for Defendant–Appellee A. Alfred Taubman.

John H. Shenefield, Morgan, Lewis & Bockius, Washington, D.C., for Defendant–Appellee Christopher J. Burge.

William J. Linklater, Baker & McKenzie, Chicago, IL, for Defendant–Appellee Christopher M. Davidge.

Andrew J. Levander, Guy Petrillo, Yun G. Lee, Swidler Berlin, Shereff Friedman, LLP, New York, NY, for Defendant–Appellee Max M. Fisher.

Michael S. Shuster, Sheron Korpus, White & Case, New York, NY, for Defendant–Appellee Stephen S. Lash.

J. Douglas Richards, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New

William J. Schwartz, Kronish Lieb Weiner & Hellman LLP, New York, NY, for Defendant–Appellee Patricia G. Hambrecht.

John Siffert, Lankler Siffert & Wohl, LLP, New York, NY, for Defendant–Appellee Diana D. Brooks.

Robert J. Mathias, Piper Marbury Rudnick & Wolfe LLP, Baltimore, MD, for Defendant–Appellee Kevin A. Bousquette.

Edward M. Shaw, New York, NY, for Defendant–Appellee Michael L. Ainslie.

Before: STRAUB, KATZMANN, and MAGILL,* Circuit Judges.

KATZMANN, Circuit Judge.

This appeal involves the extent to which the United States antitrust laws apply to conduct directed at foreign markets. The plaintiffs have filed a class action against the two largest auction houses in the world—Christie's International Plc ("Christie's") and Sotheby's Holdings, Inc. ("Sotheby's")—and a number of their local subsidiaries, directors and officers. The plaintiffs allege that the defendants entered into an agreement to fix the prices they charged their clients for their services as auctioneers. The plaintiffs all made purchases or sold goods in auctions held outside the United States and claim that they were injured because they paid inflated commissions to the defendants. The defendants have already reached a settlement with a class of plaintiffs who made purchases or sold goods in domestic auctions.

Prior to 1982, the law in this Circuit was that in order for conduct directed at foreign markets to be the basis of an antitrust action in federal court, it must have the "effect" of "injuries to United States commerce which reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. . . ." *National Bank of Canada v. Interbank Card Assoc.*, 666 F.2d 6, 8 (2d Cir.1981). That year Congress passed the Foreign Trade Antitrust Improvements Act of 1982, Pub.L. 97–290, 96 Stat. 1246 (codified at 15 U.S.C. § 6a) (the "FTAIA"), which the defendants contend exempts their alleged conduct from scrutiny under the antitrust laws. The plaintiffs claim that the FTAIA does not apply to this case and would not bar their antitrust suit against the defendants even if it were to apply.

The issue raised by this appeal, which is one of first impression in this Circuit, is the degree to which the FTAIA alters prior law, in our Circuit the *National Bank of Canada* rule, with respect to the effect that anticompetitive conduct directed at foreign markets must have on domestic commerce to be actionable under the antitrust laws. In dismissing the plaintiffs' case for lack of subject matter jurisdiction, the district court concluded that "the FTAIA permits suit, insofar as is relevant here, only where the conduct complained of had 'direct, substantial and reasonably foreseeable effects' in the United States and the effects giving rise to jurisdiction also are the basis for the alleged injury." *Kruman v. Christie's Int'l PLC,* 129 F.Supp.2d 620, 625 (S.D.N.Y.2001). Under this interpretation, the requisite domestic "effect" must cause the injury suffered by the plaintiff bringing the suit. We hold that this interpretation of the FTAIA cannot be reconciled with the unambiguous text of the statute. The FTAIA does not alter the *National Bank*

---

* The Honorable Frank J. Magill, Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

*of Canada* rule, under which anticompetitive conduct directed at foreign markets is only regulated by the Sherman Act if it has the "effect" of causing injury to domestic commerce by (1) reducing the competitiveness of a domestic market; or (2) making possible anticompetitive conduct directed at domestic commerce. We conclude that the defendants' alleged conduct qualifies under either prong of this test.

We affirm the district court's ruling that the FTAIA is applicable to the defendants' alleged conduct. However, because the plaintiffs' complaint describes conduct that has the requisite "effect" on domestic commerce under the FTAIA to be regulated by the Sherman Act, we vacate the district court's judgment granting the defendants' motion to dismiss and remand the case for further proceedings consistent with this opinion.

### BACKGROUND

On an appeal from a district court's dismissal of a case for lack of subject matter jurisdiction, we review the district court's factual findings for clear error and its legal conclusions *de novo. See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 930 (2d Cir.1998). While a district court may resolve disputed jurisdictional issues of fact through reference to evidence outside of the pleadings, *see id.* at 932, the district court in this case assumed that all of the facts alleged by the plaintiffs were true and based its dismissal solely on legal grounds. Thus, we also assume for the purposes of this appeal that the plaintiffs' factual allegations are true.

### I. The Allegations of Price Fixing

Christie's, a United Kingdom corporation, and Sotheby's, a Michigan corporation, are respectively the world's first and second largest auctioneers of fine art, antiques, collectibles, and other items, to-

gether controlling 97% of the market. Christie's and Sotheby's conduct auctions at various locations around the world, including London and New York City. At these auctions, in return for the auctioneer's services, the purchaser of an auctioned item pays the auctioneer a "buyer's premium," while the seller of the auctioned item pays the auctioneer a "seller's commission." These fees are calculated as a percentage of the purchase price of the auctioned item.

From late 1992 until at least February 7, 2000, the defendants agreed to set the buyer's premiums charged by Christie's and Sotheby's at identical levels. On November 2, 1992, Sotheby's announced it would increase its buyer's premiums from 10% to 15% for the first $50,000.00 of the purchase price. On December 22, 1992, Christie's declared an identical increase in its buyer's premiums. The defendants allegedly agreed not to reduce these premiums.

The defendants allegedly agreed not to reduce these premiums. The defendants also agreed to set their seller's commissions at identical levels. Prior to March 1995, the defendants would permit clients to negotiate smaller seller's commissions. On or about March 10, 1995, Christie's announced it would implement a fixed schedule of non-negotiable seller's commissions ranging between 2% and 10% depending on the value of the item to be sold. On April 13, 1995, Sotheby's stated it would implement a fixed schedule of non-negotiable seller's commissions substantially identical to the schedule set by Christie's.

Moreover, the defendants allegedly conspired to coordinate their policies and procedures in other areas. They agreed to restrict the ability of sellers to negotiate the terms of loans they received before the sale of their works, exchanged preferred

client lists, and otherwise monitored each other's businesses to prevent cheating.

After the Justice Department initiated an antitrust investigation in 1997, on January 28, 2000, Christie's admitted it had uncovered information relevant to the investigation and disclosed that it had been granted conditional amnesty by the Justice Department in exchange for its cooperation with federal authorities.

## II. The Plaintiffs' Action and its Dismissal by the District Court

Soon after the announcement by Christie's, a number of litigants filed class action lawsuits alleging that Christie's and Sotheby's had violated the antitrust laws through price-fixing. These lawsuits were consolidated into one action in the Southern District of New York and on April 20, 2000, the district court certified a class (the "domestic class") consisting of "all persons who purchased from or sold through defendants items offered at or sold through defendants' non-internet auctions held in the United States between January 1, 1993 and February 7, 2000." *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 164 (S.D.N.Y.2000). In May 2000, the district court selected lead counsel for the domestic class. *See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 74 (S.D.N.Y.2000).

Beginning in August 2000, a number of individuals who purchased goods at auctions conducted outside the United States filed three actions against the defendants alleging claims under the antitrust laws and customary international law. These individuals sought class certification for a class (the "foreign class") "consisting of all persons who (a) purchased any items at an auction (excluding internet transactions) conducted outside of the United States by Christie's or Sotheby's between January 1, 1993 and February 7, 2000 and paid to Christie's or Sotheby's a buyer's premium ... and/or (b) sold any items through an auction (excluding internet transactions) conducted outside of the United States by Christie's or Sotheby's between September 1, 1995 and February 7, 2000, and paid a seller's commission ... to Christie's or Sotheby's." The actions brought by the foreign class were consolidated with the class action brought by the domestic class although lead counsel for the domestic class was not lead counsel for the foreign class.

On September 22, 2000, the parties to the domestic class action informed the district court that they had reached an agreement in principle to settle the case. *See In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 170792, at *2 (Feb. 22, 2001). On October 18, 2000, the district court set a schedule for the foreign class action, requiring: (1) the plaintiffs to file their Consolidated Amended Complaint by October 30, 2000; (2) the defendants to answer or file any responsive motions by November 20, 2000; (3) the plaintiffs to respond to the defendants' motions by December 4, 2000; and (4) the defendants to reply by December 11, 2000.

The foreign class plaintiffs filed their Consolidated Amended Complaint on October 30, 2000. There are eight foreign class plaintiffs, four from the United States and four from foreign nations. They bring an action pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, alleging that the defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, by agreeing to fix their buyer's premiums and seller's commissions. The plaintiffs also alleged that this conduct violated cus-

tomary international law.[1] The plaintiffs seek damages, including treble damages, and injunctive relief.

On November 20, 2000, the defendants moved to dismiss the complaint on a number of grounds including lack of subject matter jurisdiction, lack of standing, and improper venue. In response, the plaintiffs submitted an affidavit from an economist stating that the defendants' market is worldwide and the prices of their services in the United States and abroad are linked by the same laws of supply and demand. *Kruman*, 129 F.Supp.2d at 623. On January 29, 2001, the district court granted the defendants' motion based on the first ground, lack of subject matter jurisdiction.[2] *Id.* at 627.

In its thoughtful opinion discussing its reasons for dismissing the plaintiffs' case, the district court framed the issue as "whether a transnational price fixing conspiracy that affects commerce both in the United States and in other countries inevitably gives persons injured abroad in transactions otherwise unconnected with the United States a remedy under our antitrust laws." *Kruman*, 129 F.Supp.2d at 623–24. The district court answered its question in the negative based on its reading of the FTAIA and its legislative history. After citing portions of the House Judiciary Committee Report, the district court concluded that "the FTAIA permits suit, insofar as is relevant here, only where the conduct complained of had 'direct, substantial and reasonably foreseeable effects' in the United States and the effects giving rise to jurisdiction also are the basis for the alleged injury." *Id.* at 625.

The district court determined that while there were many ways to define the word "conduct," for purposes of the FTAIA it means "[t]he precise acts that caused injury," in this case, "the imposition of charges for auction services at levels determined or affected by the illicit agreement." *Kruman*, 129 F.Supp.2d at 625. Because the plaintiffs in the foreign class only complained of paying inflated prices at foreign auctions, the district court continued, they suffered no domestic injury. Thus, the conduct that was the basis of their complaint did not have "direct, substantial and reasonably foreseeable effects" domestically "that caused the injuries to be remedied." *Id.* at 626. Put another way, while the imposition of high prices may have had an effect on the United States, this domestic effect did not give rise to the plaintiffs' injury, which was suffered in another country. Hence, according to the district court, only plaintiffs who suffer injury arising from anticompetitive conduct that affects a domestic market can bring an antitrust claim.

The district court noted that its conclusion was an application of the principle of "prescriptive jurisdiction," which limits the power of the United States to regulate conduct without a substantial effect within its territory. *Kruman*, 129 F.Supp.2d at 626. The district court also rejected the plaintiffs' argument that the FTAIA did not apply because part of the conduct occurred domestically, finding that the relevant conduct occurred overseas. *Id.* Furthermore, the court found unpersuasive the plaintiff's argument that their allegations involved import commerce, to which the FTAIA does not apply. *Id.* Lastly, the

1. The plaintiffs no longer assert this theory on appeal.

2. The district court conditionally approved a proposed settlement of the domestic class action for more than $512 million on February 22, 2001 and finally approved the settlement on April 12, 2001. *See In re Auction Houses Antitrust Litig.,* 138 F.Supp.2d 548 (S.D.N.Y. 2001).

district court dismissed the claim arising under customary international law because there is "no substantial support for the proposition that there is an international consensus proscribing price fixing that fairly might be characterized as customary international law...." *Id.* at 627.

After the district court granted the defendants' motion to dismiss, the plaintiffs moved for reconsideration. The district court denied the motion. The plaintiffs then moved to file an affidavit and exhibits with the district court. The district court denied the motion and observed that the materials would not have altered its decision to dismiss the case. *Kruman v. Christie's Int'l PLC,* No. 00 Civ. 6322, 2001 WL 252086, at *1 (S.D.N.Y. March 14, 2001).

The plaintiffs filed a notice of appeal and this appeal ensued.

## DISCUSSION

■ The plaintiffs allege that the defendants entered into an agreement to fix the prices they charged for their services as auctioneers. Part of the agreement was directed at fixing the prices in foreign auctions. Section 1 of the Sherman Act proscribes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1. A price-fixing agreement is unlawful *per se* under the Sherman Act, meaning that it is illegal regardless of whether it affects prices or reduces competition in a market. *See United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Before turning to the FTAIA, we find it helpful to begin with a discussion of the application of the antitrust laws to conduct directed at foreign markets.

## I. Application of the Antitrust Laws to Conduct Directed at Foreign Markets

■ The antitrust laws strive to foster competition in our domestic markets. *See* 1 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW 4 (2000) ("the general goal of the antitrust laws is to promote 'competition'...."). While the antitrust laws do not extend to conduct that exclusively affects foreign markets, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("American antitrust laws do not regulate the competitive conditions of other nations' economies.") (citations omitted), anticompetitive conduct directed at foreign markets can also directly affect the competitiveness of our domestic markets. There is a distinction between anticompetitive conduct directed at foreign markets that only affects the competitiveness of foreign markets and anticompetitive conduct directed at foreign markets that directly affects the competitiveness of domestic markets. The antitrust laws apply to the latter sort of conduct and not the former. Our markets benefit when antitrust suits stop or deter any conduct that reduces competition in our markets regardless of where it occurs and whether it is also directed at foreign markets. On the other hand, our markets do not benefit when antitrust suits stop or deter anticompetitive conduct directed at foreign markets without an effect on our markets.

■ Ever since Judge Learned Hand's seminal opinion in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) ("*Alcoa*"), it has been clear that the focus in determining whether the antitrust laws govern conduct is the conduct's effect on the domestic market rather than the situs of the conduct itself. Under what was called the "effects test," foreign conduct was actionable under our

antitrust laws if it was intended to affect domestic commerce and actually did so. *See id.* at 443–44. In contrast, "[w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." *Id.* at 443 (citations omitted). The Supreme Court recently reaffirmed these fundamental principles when it stated that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (citations omitted).

■ In this Circuit, though, we have recognized that an unmodified "effects test" is too broad in its regulation of conduct. If conduct affecting foreign markets has a substantial but beneficial effect on our markets, such conduct does not implicate the concerns of the antitrust laws, which are meant to protect our markets from negative effects. Thus, just prior to the passage of the FTAIA, we modified the "effects test" by giving the term "effect" a specific and narrower meaning than its common usage. In *National Bank of Canada,* we held that we only have jurisdiction to hear an antitrust claim arising out of conduct directed at foreign markets if the conduct had the "effect" of "injuries to United States commerce which reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. . . ." *National Bank of Canada,* 666 F.2d at 8. In other words, under *National Bank of Canada,* the antitrust laws apply to anticompetitive conduct directed at foreign markets only if such conduct injures domestic commerce by either (1) reducing the competitiveness of a domestic market; or (2) making possible anticompetitive conduct directed at domestic commerce.

The first prong of the *National Bank of Canada* test would clearly encompass a situation where anticompetitive conduct is directed at both foreign and domestic markets and actually reduces the competitiveness of the domestic market. The mere fact that such conduct targets a foreign market in addition to a domestic market does not mean that it should be exempt from our antitrust laws. If such a course of conduct is successful and reduces the competitiveness of our markets, it would certainly fall within our antitrust laws. The second prong of the *National Bank of Canada* test encompasses a situation where anticompetitive conduct is directed only at a foreign market, but has the effect of allowing a separate course of conduct that directly affects the competitiveness of our domestic markets. Again, because such conduct affects the competitiveness of our domestic markets, the antitrust laws apply.

## II. The FTAIA

■ The district court dismissed the plaintiffs' action based on its reading of the FTAIA, which provides:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section. If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. "The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy," *Hartford Fire Ins. Co.*, 509 U.S. at 796 n. 23, 113 S.Ct. 2891 (citing H.R. Rep. 97–686, at 2–3, 9–10 (1982), U.S. Code Cong. & Admin. News at 2487, 2487–89, 2494–96), and also enacted "a single, objective test—the 'direct, substantial, and reasonably foreseeable effect' test" that "will serve as a simple and straightforward clarification of *existing American law.* ..." H.R. Rep. 97–686, at 2, U.S. Code Cong. & Admin. News at 2487 (emphasis added). The issue on this appeal is whether the FTAIA "amends existing law or merely codifies it." *Hartford Fire Ins. Co.*, 509 U.S. at 796 n. 23, 113 S.Ct. 2891. The Supreme Court has not addressed this issue and it is one of first impression in this Circuit.

A. Applicability of the FTAIA

 Initially, the plaintiffs contend that the FTAIA does not apply because some of the meetings concerning the agreement to fix prices occurred in the United States. But this interpretation of the FTAIA would mean that an agreement to fix prices in an overseas foreign market that had no effect on domestic commerce could be the basis of an antitrust suit as long as some of the meetings negotiating the agreement occurred in the United States. This would alter the longstanding rule articulated in *Alcoa* and reaffirmed in *Hartford Fire Ins.* that it is the effect and not the location of the conduct that determines whether the antitrust laws apply, and that the antitrust laws do not regulate conduct without a substantial effect on domestic markets. As the House Judiciary Committee Report accompanying the FTAIA legislation stated approvingly: "Since Judge Learned Hand's opinion in *United States v. Aluminum Co. of America*, 148 F.2d 416, 443–44 (2d Cir.1945), it has been relatively clear that it is the situs of the effects, as opposed to the conduct, that determines whether United States antitrust law applies." H.R. Rep. 97–686, at 5, U.S. Code Cong. & Admin. News at 2490. The application of the FTAIA hinges on whether the "conduct" involves foreign trade or commerce. Clearly, when there is conduct directed at reducing the competitiveness of a foreign market, as there was in this case, such conduct involves foreign trade or commerce, regardless of whether some of the conduct occurred in the United States.

 The plaintiffs also claim that this is a case involving "import trade or import commerce," to which the FTAIA does not apply. The relevant inquiry is whether the conduct of the defendants—not the plaintiffs—involves import trade or commerce. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 71–72 (3d Cir.2000). The plaintiffs did not describe conduct by the defendants that was directed at an import market. To the contrary, the defendants' conspiracy appears to have been directed at controlling the prices they charged for their services in foreign auctions. As the district court aptly observed, "[t]he commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold." *Kruman*, 129 F.Supp.2d at 626. While some of the goods purchased in those auctions may

ultimately have been imported by individuals in the United States, the object of the conspiracy was the price that the defendants charged for their auction services, not any import market for those goods.

We affirm the district court's ruling that the FTAIA applies to the plaintiffs' allegations concerning the defendants' conduct.

## B. The Meaning of the FTAIA

### 1. Injury

■ Recall that prior to the FTAIA, in this Circuit, the antitrust laws only applied to anticompetitive conduct directed at foreign markets if it caused injury to domestic commerce either by (1) reducing the competitiveness of a domestic market; or (2) making possible anticompetitive conduct directed at domestic commerce. The district court concluded that the FTAIA added another requirement to this standard. It held that "the FTAIA permits suit, insofar as is relevant here, only where the conduct complained of had 'direct, substantial and reasonably foreseeable effects' in the United States and the effects giving rise to jurisdiction also are the basis for the alleged injury." *Kruman*, 129 F.Supp.2d at 625; *see also Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 427 (5th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1059, 151 L.Ed.2d 967 (2002) (00–1842). The district court interpreted the word "conduct" in the FTAIA as meaning "[t]he precise acts that caused injury," in this case, "the imposition of charges for auction services at levels determined or affected by the illicit agreement." *Kruman,* 129 F.Supp.2d at 625.

The defendants argue that the FTAIA adds a new plaintiff's injury element to prior law, specifically a requirement that defendants are only liable to plaintiffs who suffer injuries in domestic commerce. Put another way, the defendants claim that the FTAIA sets rules with respect to which plaintiffs can bring suit for anticompetitive conduct directed at foreign markets. Under the defendants' interpretation of the FTAIA, such conduct must not only have a domestic effect that is anticompetitive, but only plaintiffs who suffer injury from that domestic effect are permitted to bring a Clayton Act suit for that conduct. The implication of this reading is that plaintiffs who are injured overseas by anticompetitive conduct directed at foreign markets are barred from bringing suit, even if such conduct has hurt the competitiveness of our markets.

We find that an interpretation centered on whether the plaintiff has suffered domestic injury cannot be squared with the text of the FTAIA. The statute only refers to the word "injury" once and does so in the context of conduct with an effect on non-domestic export markets. The final sentence or "proviso" of the FTAIA provides: "If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B),"—in other words, only because the conduct affects export trade with foreign nations—"then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a. This injury element, on its face, applies only to a subset of the conduct covered by the FTAIA. The defendants, though, would have us apply an injury requirement not only to that narrow category of export-related conduct, but to all conduct within the ambit of the FTAIA. However, if the main provisions of the FTAIA were interpreted as the defendants propose—as allowing a remedy only for domestic injury caused by anticompetitive conduct directed at foreign markets—then the proviso would be superfluous. *See, e.g., Den Norske Stats Oljeselskap,* 241 F.3d at 432 n. 5 (Higginbotham, J., dissenting).

■ By proposing that the FTAIA contains a broader plaintiff's injury requirement than can be supported by its text, the defendants assume that the FTAIA, which is an amendment to the Sherman Act, *see* H.R. Rep. 97–686, at 3, U.S. Code Cong. & Admin. News at 2488, determines which plaintiffs have the right to bring a private cause of action for antitrust injury caused by conduct directed at foreign markets. In doing so, they conflate the FTAIA with the Clayton Act, which is the statute that determines whether a plaintiff may bring a private cause of action for a violation of the antitrust laws based on its actual or threatened injury. For example, section 4 of the Clayton Act gives "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws," the right to a federal action for treble damages. 15 U.S.C. § 15; *see generally Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (deriving requirement that a plaintiff suffer antitrust injury from section 4 of the Clayton Act).[3] "[I]t is section 4 of the Clayton Act that gives rise to the antitrust injury requirement, not sections 1 or 2 of the Sherman Act." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989).

■ Generally, in the antitrust context, the issue of whether a plaintiff has suffered an injury is only relevant to the Clayton Act. The Sherman Act primarily deals with defendants. It defines substantive standards that prohibit certain forms of anticompetitive conduct by defendants. The Clayton Act deals with plaintiffs. It

sets forth the requirement that a plaintiff must suffer an injury or be threatened with an injury caused by a Sherman Act violation in order to bring suit. The conduct and injury requirements of the Sherman and Clayton Acts operate independently. The existence of a Sherman Act violation does not depend on whether anyone has actually suffered an injury. Conduct may violate the Sherman Act but not be actionable under section 4 of the Clayton Act because it did not cause injury. *See, e.g., Indiana Grocery, Inc.,* 864 F.2d at 1419 ("the mere presence of a substantive Sherman Act section 1 violation . . . does not by itself bestow on any plaintiff a private right of action for damages."). On the other hand, while actual injury is required to seek treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff may bring an antitrust action seeking prospective injunctive relief under section 16 of the Clayton Act for conduct violating the Sherman Act without suffering an actual injury. *See* 15 U.S.C. § 26; *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 243, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (noting that an inability to establish injury for conduct violating the Sherman Act only confines the available remedy to injunctive relief); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (noting that remedy of injunctive relief is available under the Clayton Act "even though the plaintiff has not yet suffered actual injury . . . .") (citation omitted). A plaintiff's injury, whether actual or threatened, is relevant to the Clayton Act, which gives a plaintiff the right to bring suit, and not the Sherman

---

**3.** While the treble damages action for persons injured by antitrust violations was originally enacted in section 7 of the Sherman Act, it was later re-enacted in 1914 as section 4 of the Clayton Act, and section 7 of the Sherman Act was repealed in 1955 as redundant. *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 311, 311 n. 8, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).

Act, which sets forth substantive rules governing conduct.

 Finally, the Sherman Act contains its own enforcement provision that can be invoked by the United States even when no plaintiff has suffered an injury. Under the Sherman Act, federal district courts "are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys ... under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations." 15 U.S.C. § 4. This section allows the federal government to bring an equity action to enjoin a violation of the Sherman Act. Actions brought for injuries pursuant to the Clayton Act are only one way in which the Sherman Act can be enforced.

 The substantive provisions of the Sherman Act determine what conduct by the defendant is actionable. The Clayton Act determines what injury a plaintiff must suffer in order to bring suit. Thus, when the defendants argue that the FTAIA permits liability only for domestic injuries caused by anticompetitive conduct directed at foreign markets, they are asking us to amend the FTAIA by incorporating a concept from the Clayton Act.

2. "Conduct"

 The FTAIA exempts certain forms of anticompetitive conduct directed at foreign markets from antitrust scrutiny. The text of the FTAIA clearly reveals that its focus is not on the plaintiff's injury but on the defendant's conduct, which is regulated by the Sherman Act. The FTAIA does not regulate which plaintiffs can bring suit under the Clayton Act, and it

would be inappropriate to import the element of injury from the Clayton Act and graft it onto the FTAIA. The FTAIA mandates: "[s]ections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations," 15 U.S.C. § 6a. The FTAIA is an amendment to the Sherman Act, see H.R. Rep. 97–686, at 3, U.S. Code Cong. & Admin. News at 2488, so when the FTAIA refers to "[s]ections 1 to 7 of this title," it is referencing the Sherman Act.[4] Thus, the word "conduct" refers to any conduct that would violate sections 1 to 7 of the Sherman Act absent the FTAIA. Such conduct necessarily focuses on the acts of the defendant, not the injury to the plaintiff needed to bring a Clayton Act action.

 The district court interpreted the word "conduct" to mean "[t]he precise acts that caused injury," which in this case was "the imposition of charges for auction services at levels determined or affected by the illicit agreement." *Kruman,* 129 F.Supp.2d at 625. But as discussed earlier, "conduct" only refers to acts that are illegal under the Sherman Act. The illegal act in this case was not the imposition of high prices but the formation of the agreement to fix prices. Under the Sherman Act, such a horizontal price agreement is in itself illegal regardless of its effect or purpose. *See United States v. National Assoc. of Real Estate Bds.,* 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *Socony–Vacuum Oil Co.,* 310 U.S. at 218, 60 S.Ct. 811; *Alcoa,* 148 F.2d at 427. The "essence" of the section 1 violation alleged by the plaintiffs "is the illegal agreement itself—rather than the overt acts performed in furtherance of it. ..." *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 330,

4. The Sherman Act is codified at 15 U.S.C. §§ 1–7 while the Clayton Act is codified at 15 U.S.C. §§ 12–27a.

111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The fact that the defendants charged these particular plaintiffs prices determined by an illicit agreement is only relevant to whether they have an action under the Clayton Act and has no bearing on the issue of whether the Sherman Act was violated by the defendants. The defendants' agreement to fix prices would be "conduct" that violates the Sherman Act regardless of whether they charged the plaintiffs high prices or whether the plaintiffs suffered injury. In sum, the "conduct" in this case was not the imposition of high prices pursuant to an illicit agreement, but the alleged agreement by the defendants to fix prices in foreign auction markets.

3. "Effect" that "Gives Rise to a Claim"

In this case, the plaintiffs must demonstrate that the agreement to fix prices in foreign auction markets had an "effect" [5] on domestic commerce.[6] As discussed earlier, prior to the passage of the FTAIA, we defined in *National Bank of Canada* the meaning of the word "effect" as applied in the antitrust context. Under *National Bank of Canada*, anticompetitive conduct directed at foreign markets has the requisite "effect" on domestic commerce needed for the Sherman Act to apply if it caused injury to domestic commerce by (1) reducing the competitiveness of a domestic market; or (2) making possible anticompetitive conduct directed at domestic commerce. Now, however, the word "effect" is defined by subsection 2 of the FTAIA, which only allows an antitrust action based on anti-

competitive conduct directed at foreign markets whose domestic "effect gives rise to a claim under the provisions of sections 1 to 7 of this title. . . ." 15 U.S.C. § 6a(2).

■ We do not agree that subsection 2 of the FTAIA changed the *National Bank of Canada* test to require that the "effect" on domestic commerce be the basis for the alleged injury suffered by a plaintiff. The defendants argue that the requirement that the "effect" on domestic commerce "give[ ] rise to a claim under the provisions of sections 1 to 7 of this title," 15 U.S.C. § 6a(2), means that a plaintiff's injury that would give it the right to bring an action must result from the conduct's effect on domestic commerce. Again, such an interpretation imports the concept of the injury a plaintiff must suffer to bring a Clayton Act action when the FTAIA only refers to the Sherman Act. The text clearly refers to "a claim under the provisions of sections 1 to 7 of this title," and "this title" refers to the Sherman Act, not the Clayton Act. The language "gives rise to a claim" only requires that the "effect" on domestic commerce violate the substantive provisions of the Sherman Act. As we established earlier, a violation of the Sherman Act is not predicated on the existence of an injury to a plaintiff. In fact, the only civil action that can be brought directly under the Sherman Act is one by the federal government to enforce or prevent a substantive violation of the Sherman Act pursuant to 15 U.S.C. § 4. Such an action can be brought regardless of whether the viola-

**5.** The defendants do not dispute that there was a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. Therefore, we do not address the issue of how this language in the FTAIA affects the law prior to the FTAIA.

**6.** We note that under the FTAIA the antitrust laws regulate conduct with a "direct, substan-

tial, and reasonably foreseeable effect" on export commerce that also meets the requirements of subsection (2) of the FTAIA. In this case, the plaintiffs do not allege that the defendants' conduct had such an effect, so our analysis is confined to the conduct's requisite "effect" on domestic commerce.

tion has caused injury to a plaintiff.[7] If Congress meant for the FTAIA to govern the sort of injury a plaintiff must suffer to bring suit under the Clayton Act, it could have amended the Clayton Act or referred to the Clayton Act within the text of the FTAIA. Rather than require that the domestic effect give rise to an injury that would serve as the basis for a Clayton Act action, subsection 2 of the FTAIA only requires that the domestic effect violate the substantive provisions of the Sherman Act.

 Moreover, adopting the defendants' interpretation would mean rewriting the statute to replace the word "a" in subsection 2 with the words "the plain-tiff's", resulting in a new subsection 2 that requires that the "effect give[ ] rise to *the plaintiff's* claim." Where possible, we are guided by the plain meaning of the statute itself. *See Lebron v. Russo*, 263 F.3d 38, 41 (2d Cir.2001) (per curiam). "Barring exceptional circumstances, where the terms of a statute are unambiguous, judicial review begins and ends with a review of the statute's terms." *Id.* Here, the language is clear. Congress used the indefinite article ("a") rather than the definite article ("the"). As a court, we must be faithful to, and honor legislative meaning. The "effect" on domestic commerce need not be the basis for a plaintiff's injury, it only must violate the substantive provisions of the Sherman Act.[8]

**7.** At first glance, the words "a claim" could be thought to refer exclusively to a private right of action for damages. But the word "claim" has also been defined to include "any right ... to an equitable remedy...." BLACK'S LAW DICTIONARY 240 (7th ed.1999).

Moreover, subsection 2 of the FTAIA refers specifically to a claim "under the provisions of sections 1 to 7 of this title...." 15 U.S.C. § 6a(2). Thus, the text clearly refers to a claim brought directly pursuant to a provision of the Sherman Act.

Finally, Congress has not necessarily used the word "claim" to refer exclusively to a private action for damages. For example, the Federal Trade Commission Act (the "FTCA"), which regulates the jurisdiction of the Federal Trade Commission (the "FTC") to bring actions against certain conduct directed at foreign markets, contains language identical to subsection 2 of the FTAIA. Unfair methods of competition directed at foreign markets are only actionable if they have an effect on domestic or export commerce and "such effect gives rise to a claim [under the FTCA]...." *See* 15 U.S.C. § 45(a)(3). The FTC has the power to enforce the substantive provisions of the FTCA regardless of whether a plaintiff has suffered injury. *See* 15 U.S.C. § 45.

**8.** The defendants cite to a passage in the House Judiciary Committee Report, which noted that "the full committee added language to the Sherman [Antitrust Act] ... to require that the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws." H.R. Rep. 97–686, at 11–12, U.S. Code Cong. & Admin. News at 2496–97. But this language is consistent with the general requirement that the "effect" of the conduct cause the sort of injury protected against by the antitrust laws in the domestic market in order to be actionable. It does not speak to the issue of whether the particular plaintiff bringing the suit must have suffered an injury caused by the domestic anticompetitive effects of the conduct. It is clear that this passage is referring to the conduct of the defendant rather than the injury suffered by the plaintiff. The sentence immediately prior to this language notes that "[t]he Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace." *Id.* at 11, U.S. Code Cong. & Admin. News at 2496. This language implies that there is jurisdiction when the injury arises from conduct that does have a direct anticompetitive effect on the domestic marketplace. Finally, the Report explained that the language it added "does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States." *Id.* at 12, U.S. Code Cong. & Admin. News at 2497.

To support our view that subsection 2 of the FTAIA does not modify the test we promulgated in National Bank of Canada, we note that, in fact, the House Judiciary Committee Report specifically and approvingly references *National Bank of Canada.* H.R. Rep. 97–686, at 11, U.S. Code Cong. & Admin. News at 2496 ("the domestic 'effect' that may serve as the predicate for antitrust jurisdiction under the bill must be of the type that the antitrust laws prohibit. *See, e.g., National Bank of Canada v. Interbank Card Ass'n,* 666 F.2d 6, 8 (2d Cir.1981)."). Conduct meeting the first prong of the *National Bank of Canada* test would clearly have an effect on domestic commerce and give rise to a claim under the Sherman Act because a plaintiff would have to show that such conduct was directed at both domestic and foreign markets and actually reduced the competitiveness of a domestic market.[9] Moreover, conduct meeting the second prong would satisfy the requirements of subsection 2 of the FTAIA because it would have the effect on domestic commerce of making possible anticompetitive conduct that "gives rise to a claim" under the Sherman Act.

Thus, we conclude that the FTAIA does not alter the law of this Circuit with respect to the requisite "effect" on domestic commerce needed to support an antitrust claim based on conduct that is also directed at foreign markets.

4. Application to the Plaintiffs' Action

We now apply our interpretation of the FTAIA to the allegations in the plaintiffs' complaint. If it is true, as the plaintiffs allege, that the domestic price-fixing agreement could only have succeeded with the foreign price-fixing agreement, then the foreign agreement certainly had an anticompetitive effect on the domestic market. The relevant "conduct" in this case can be described in two ways that correspond to the two prongs of the *National Bank of Canada* test, both of which meet the requirements of the FTAIA. The "conduct" could be an agreement to fix prices in both foreign and domestic auction markets. Such acts have an effect on domestic commerce because they include conduct directed at a domestic market. The plaintiffs allege that this "conduct" actually reduced competitiveness in the domestic auction market. The domestic effect of the conduct clearly violates the Sherman Act. Alternatively, the "conduct" could be described as an agreement to fix prices in a foreign auction market that made possible an agreement to fix prices in the domestic auction market. The "effect" of the foreign agreements, the negotiation of explicit domestic price-fixing agreements that clearly violate section 1 of the Sherman Act, "gives rise to a claim" under the Act. Therefore, the FTAIA does not shield the defendants' conduct from scrutiny under the antitrust laws.

---

**9.** One example of such a scheme might be an international cartel whose anticompetitive conduct was directed at both domestic and foreign markets. The FTAIA was clearly intended to regulate such conduct. As the House Judiciary Committee Report generally explains:

Any major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction. For example, if a domestic export cartel were so strong as to have a 'spillover' effect on commerce within this country—by creating a world-wide shortage or artificially inflated world-wide price that had the effect of raising domestic prices—the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce.

H.R. Rep. 97–686, at 13, U.S. Code Cong. & Admin. News at 2498.

### III. Policy Considerations

 The defendants argue that their reading of the FTAIA is needed to prevent antitrust actions by foreign plaintiffs for conduct that has no relationship to the United States. But general policy considerations cannot justify reading the FTAIA in a way contrary to its unambiguous text. The FTAIA simply does not determine which plaintiffs can bring suit. Rather, it governs what conduct by a defendant is regulated by the antitrust laws. Moreover, the requirement that the "effect" of the anticompetitive conduct directed at foreign markets "give[ ] rise to a claim" under the Sherman Act is essentially another form of the *National Bank of Canada* test. Because this interpretation of the FTAIA simply confirms the existing law in this Circuit, we do not accept the defendants' assertion that allowing the plaintiffs' case to proceed would open the floodgates.

One of the concerns raised by the defendants is that because of the global nature of today's markets, any anticompetitive conduct that affects markets abroad could conceivably have an impact on our economy. But such conduct is not actionable under the *National Bank of Canada* test unless it causes an injury to domestic commerce through an anticompetitive effect or by making possible anticompetitive acts directed at domestic commerce. Moreover, we note that the FTAIA provides another significant limit on the reach of the antitrust laws that may address this concern. The "effect" of the conduct must be "direct, substantial, and reasonably foreseeable ..." 15 U.S.C. § 6a(1). Because the defendants did not argue that the effect of their conduct on domestic commerce was not direct, substantial, or reasonably foreseeable, we did not address this requirement in deciding this appeal. However, we observe that this limit will likely prevent conduct that merely has an ancillary effect on our markets from being actionable under our antitrust laws.

 This case is unique in that it alleges a scheme in which there were explicit agreements to fix prices in both foreign and domestic markets. It is clear that such explicit agreements violate the Sherman Act and would "give[ ] rise to a claim" under that act. In many other cases, there may not be evidence of such an explicit agreement. *See, e.g., Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (10th Cir.1991) ("We recognize that only in rare cases ... can a plaintiff establish the existence of a section 1 conspiracy by showing an explicit agreement....."). Without an explicit agreement, a viable claim under section 1 of the Sherman Act must be supported by evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotes and citation omitted). Even if a domestic company subsequently increases its prices after foreign companies increase prices pursuant to an illicit agreement, absent proof of additional "plus" factors that establish that the domestic company did not act independently, there would not be a "claim" under section 1 of the Sherman Act. *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.1987). We also note that higher prices without a showing of anticompetitive conduct are not enough to establish a monopolization claim under section 2 of the Sherman Act. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir.1979). Because anticompetitive conduct cannot be established through an increase in prices alone, there are natural limits to the types of anticompetitive conduct directed at foreign mar-

kets that will be actionable pursuant to the antitrust laws under the FTAIA.

A final complex issue that is raised by this case is the utility of lawsuits by plaintiffs injured in foreign markets by conduct that negatively affects our markets. One might argue that our antitrust laws will be effectively enforced as long as the plaintiffs injured by the domestic anticompetitive effects of such conduct bring suit. A response to this argument is that when anticompetitive conduct is directed at both foreign and domestic markets, the success of an anticompetitive scheme in foreign markets may enhance the effectiveness of an anticompetitive scheme in the domestic market. When a foreign scheme magnifies the effect of the domestic scheme, and plaintiffs affected only by the foreign scheme have no remedy under our laws, the perpetrator of the scheme may have a greater incentive to pursue both the foreign scheme and the domestic scheme rather than the domestic scheme alone. Our markets suffer when the foreign scheme is not deterred because the domestic scheme may have a greater chance of success when it is supplemented by the foreign scheme. Our markets can benefit from the additional deterrence of conduct

affecting foreign markets. *See Pfizer, Inc.,* 434 U.S. at 313–15, 98 S.Ct. 584.[10]

Ultimately, however, the only issue we resolve on this appeal is whether the Sherman Act applies to the conduct that is the basis for the plaintiffs' action, and we find that it does. While the defendants ask this Court to affirm the district court's dismissal based on their lack of standing and improper venue arguments, because the district court did not address these issues in its opinion granting the motion to dismiss, we remand the case so that the district court may examine these issues in the first instance.

## CONCLUSION

For the reasons stated above, we affirm in part, vacate in part, and remand the case for further proceedings consistent with this opinion.

**10.** We note that the House Judiciary Committee Report contains language consistent with this principle and cites *Pfizer.* As the Report observes:

A course of conduct in the United States— *e.g.,* price fixing not limited to the export market—would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf., e.g., Pfizer Inc., et al v. Government of India, et al,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny

them this protection could violate the Friendship, Commerce and Navigation treaties this country has entered into with a number of foreign nations.

There are other reasons for preserving the rights of foreign persons to sue under our laws when the conduct in question has a substantial nexus to this country. As the Supreme Court pointed out in *Pfizer,* supra, 434 U.S. at 314–15, 98 S.Ct. 584, to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons. H.R. Rep. 97–686, at 10, U.S. Code Cong. & Admin. News at 2495.